RENDERED: JULY 10, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1048-MR

CHARLES JUSTICE                                        APPELLANT

v.                  APPEAL FROM CAMPBELL CIRCUIT COURT
HONORABLE JULIE REINHARDT WARD, JUDGE
ACTION NO. 18-CR-00357

COMMONWEALTH OF KENTUCKY                      APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, McNEILL, AND MOYNAHAN, JUDGES.

CALDWELL, JUDGE: On January 24, 2020, following a four-day trial, a Campbell Circuit Court jury convicted Charles Dean Justice ("Justice") of four counts of first-degree sexual abuse, incest, attempted first-degree rape, attempted promotion of a sexual performance by a minor, distribution of matter portraying a sexual performance by a minor, promotion of a sexual performance by a minor, and being a first-degree persistent felony offender. Justice's charges stemmed from his alleged illicit conduct toward four minor girls, C.J., E.W., L.W., and T.W.

The trial court imposed the 220 years' imprisonment sentence fixed by the jury. On direct appeal, the Kentucky Supreme Court partially affirmed, partially reversed, and remanded for further proceedings. Thereafter, two of his counts were dismissed, and his sentence was reduced to 70 years' imprisonment. Justice now appeals an order of the Campbell Circuit Court denying his subsequent Kentucky Rule of Criminal Procedure (RCr) 11.42 motion to vacate his sentence and grant him a new trial. Upon review, we affirm.

## BACKGROUND

Justice's underlying criminal action was adjudicated on direct appeal in *Justice v. Commonwealth*, 636 S.W.3d 407 (Ky. 2021). In the interest of judicial economy, we adopt the rendition of the facts set forth therein as follows:

> Brittney's child, C.J., told her that her biological father, Brittney's ex-husband, Charles Justice, had raped her. After Brittney relayed this to C.J.'s school counselor, a formal police investigation ensued. C.J. was interviewed at the Child Advocacy Center (CAC), and, after watching the interview, the lead detective went to the residence Justice occupied with his girlfriend, Emily, and her three daughters, E.W., L.W., and T.W., and two sons. While there, the detective disclosed to Justice what C.J. had said in her interview and collected from the residence some electronic devices and sex toys. The detective returned to the CAC, where Emily's three daughters were interviewed. The detective also interviewed Justice at the police station.
>
> Meanwhile, the police received a tip from the National Center for Missing and Exploited Children of an apparently homemade image of child pornography

-2-

depicting a very young child's vagina spread open by two adult fingers. The IP address for the image was traced back to Justice's residence. Detectives executed a search warrant for the electronics located in Justice's residence and requested a DNA test on the sex toys collected from the residence. The DNA test reported matches for both E.W. and Justice on samples taken from several of the sex toys. Detectives also showed the pornographic image to E.W.'s mother, and she identified the adult hand as Justice's hand as well as the bedsheets appearing in the background of the image. Justice's phone was found to have bookmarked the website where the image had been uploaded.

At trial, C.J., E.W., and L.W. testified regarding the abuse they had suffered. C.J. testified that Justice touched her with his hands and penis several times. She also testified he had instructed her to use sex toys and to perform oral sex on him. She testified that E.W. was present during some of these encounters and that Justice instructed E.W. to use the sex toys as well. C.J. also testified that Justice took photographs of her but that she did not realize what he was doing at the time. Finally, C.J. testified that Justice threatened to kill her if she told anyone.

E.W. testified that Justice also touched her with his hands several times. She also testified that Justice touched her vagina with his penis more than once, that she could feel it poking her, and that it hurt, but that his penis never went inside her. E.W. said Justice had asked her to use the sex toys and she did,[1] but they were alone when it happened.

The jury found Justice guilty of attempted rape in the first-degree, four counts of first-degree sexual abuse, one count of incest, one count of promoting a sexual

---

[1] At trial and as set forth below, E.W. denied using the sex toys, but other evidence contradicted her denial.

performance by a minor, one count of attempted promotion of a sexual performance by a minor, and one count of distribution of matter portraying a sexual performance by a minor. The jury recommended a sentence of 220 years' imprisonment. The trial court accepted the recommendation and sentenced Justice accordingly.

*Id*. at 410-11.

The Kentucky Supreme Court affirmed in part, reversed in part, and remanded for further proceedings after overturning Justice's convictions for attempted rape and sexual abuse of E.W. due to a set of duplicitous jury instructions relating to those counts. On March 3, 2022, the Campbell Circuit Court sustained the Commonwealth's motion to dismiss both of those counts with prejudice, and Justice's total sentence was capped at 70 years' imprisonment. On November 7, 2022, Justice then moved for RCr 11.42 relief, claiming he received ineffective assistance of counsel for a multitude of reasons discussed below. The trial court addressed some of his arguments summarily (in an August 11, 2023 order) and the remainder of them (in a July 29, 2024 order) following an evidentiary hearing, but it ultimately rejected all of his arguments. This appeal followed. Additional facts will be discussed in our analysis.

## STANDARD OF REVIEW

In a motion brought under RCr 11.42, "[t]he movant has the burden of establishing convincingly that he or she was deprived of some substantial right

-4-

which would justify the extraordinary relief provided by [a] post-conviction proceeding." *Simmons v. Commonwealth*, 191 S.W.3d 557, 561 (Ky. 2006), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151, 159 (Ky. 2009) (citation omitted). A successful petition for relief under RCr 11.42 for ineffective assistance of counsel must survive the twin prongs of "performance" and "prejudice" provided in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); *accord Gall v. Commonwealth*, 702 S.W.2d 37, 39-40 (Ky. 1985).

Regarding the first of those two prongs, "[a] deficient performance contains errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Commonwealth v. McGorman*, 489 S.W.3d 731, 736 (Ky. 2016) (internal quotation marks and citation omitted). Moreover, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065 (internal quotation marks omitted). As further stated in *Strickland*, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions

-5-

in the exercise of reasonable professional judgment." *Id*. at 690, 104 S. Ct. at 2066.

As to the second *Strickland* prong, conclusory allegations of prejudice are insufficient. *See Stiger v. Commonwealth*, 381 S.W.3d 230, 237 (Ky. 2012) (citations and footnote omitted). The appellant must show a "reasonable probability" that the outcome of the proceeding would have been different. *Bowling v. Commonwealth*, 981 S.W.2d 545, 551 (Ky. 1998) (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Teague v. Commonwealth*, 428 S.W.3d 630, 633 (Ky. App. 2014) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). Appellate review of counsel's performance under *Strickland* is *de novo*. *See McGorman*, 489 S.W.3d at 736.

Where, as here, the trial court conducts an evidentiary hearing regarding the claim of ineffective assistance of counsel, RCr 11.42(6) requires the court to "make findings determinative of the material issues of fact and enter a final order accordingly." *Cawl v. Commonwealth*, 423 S.W.3d 214, 216 (Ky. 2014). "[W]hen reviewing a trial court's findings of fact following an RCr 11.42 evidentiary hearing, an appellate court utilizes the clearly erroneous standard set forth in Kentucky Rules of Civil Procedure (CR) 52.01. Findings of fact are not clearly erroneous if supported by substantial evidence. Even though claims of

-6-

ineffective assistance of counsel are subject to *de novo* review, a reviewing court should defer to the determination of facts made by the trial judge." *Saylor v. Commonwealth*, 357 S.W.3d 567, 570-71 (Ky. App. 2012) (citations omitted).

## ANALYSIS

On appeal, Justice asserts he was entitled to RCr 11.42 relief for the following reasons summarized below:

1. Either his trial counsel failed to properly request a continuance, or his request was improperly denied by the trial court;

2. His trial counsel failed to have an individual by the name of Shelia Smothers testify at this trial;

3. His trial counsel failed to obtain information and reports from the victims' schools and videos from CPS, or to hire a clinical psychologist;

4. His trial counsel failed to make various objections relating to evidence and testimony provided at his trial by "Detective Greg Adams";

5. His trial counsel failed to hire a DNA expert;

6. His trial counsel failed to hire a private investigator;

7. His trial counsel failed to hire an "identification" expert;

8. His trial counsel failed to make an adequate directed verdict motion;

9. His trial counsel failed to object to a variety of errors in the jury instructions (apart from what the Kentucky Supreme Court addressed during Justice's direct appeal);

10. His trial counsel failed to "investigate, present or hire a mitigation expert for mitigation";

11. His trial counsel failed to object to a line of questioning from the Commonwealth during voir dire;

12. His trial counsel failed to object to testimony provided by Drs. Anderson and Segal;

13. His trial counsel failed to object to "vouching" testimony provided by E.W.'s, L.W.'s and T.W.'s mother, Emily;

14. His trial counsel failed to object to a "golden rule" argument from the Commonwealth during its closing arguments in the sentencing phase of his trial;

15. His trial counsel failed to object to a "golden rule" argument and the display of a picture during the Commonwealth's closing arguments in the guilt phase of his trial;

16. His trial counsel failed to object to the Commonwealth's "misstatement of DNA evidence" during its closing arguments in the guilt phase of his trial;

17. The trial court erred, and demonstrated bias warranting recusal, by denying his RCr 11.42 counsel's motion to supplement his RCr 11.42 motion to raise additional issues; and

18. The trial court erred by only granting him an evidentiary hearing on some, but not all, of the issues he raised in his RCr 11.42 motion.

We will address these points in turn.

**1. "Either his trial counsel failed to properly request a continuance, or his request was improperly denied by the trial court."**

Justice was indicted June 7, 2018. Afterward, Honorable Sheena Baylon was appointed to represent him and his trial was set for December 2, 2019. On November 11, 2019, Justice hired private counsel to replace Baylon. On November 12, 2019, his private counsel, Honorable Bradley Fox, then moved for a continuance. Fox explained in his written motion that he needed additional time to review the discovery, familiarize himself with the case, and prepare for trial. Fox did not specify a time frame in his written motion, but he explained to the trial court at the November 15, 2019 hearing on the motion that he believed a continuance until the end of January or beginning of February 2020 would suffice. In a November 20, 2019 order, the trial court granted the continuance and rescheduled Justice's trial for January 21, 2020.

On appeal, Justice argues he is entitled to a new trial and that the trial court erred in finding to the contrary because Fox's November 12, 2019 motion to

continue his trial date caused a violation of the Sixth Amendment. The substance

of Justice's argument, in his words, is that "the trial court did not consider how its

*denial* of a continuance could affect *Whitaker's* rights under the Sixth

Amendment," and that

> the trial court interfered with Justice's right to effective
> assistance of counsel and trial counsel was ineffective for
> failing to properly request a continuance, which prejudice
> is presumed and, but for the trial court's interference and
> counsel's ineffectiveness, there is a reasonable
> probability of a different outcome in counsel receiving
> more time to prepare and investigate the case, and
> present a complete defense under the due process clause.

Appt. Br. at 3 (emphasis added).

This argument lacks merit for a variety of reasons. To begin, the

record does not disclose who "Whitaker" is, how "Whitaker's" Sixth Amendment

rights were affected by Justice's motion for a continuance, or why "Whitaker's"

rights are relevant. As it relates to *Justice*, we remind him that the trial court did

not deny but rather *granted* his motion for a continuance. If Justice is arguing his

counsel should have requested a longer continuance, Justice presents nothing more

than his own speculation that two and a half months – roughly the time frame

between the date he hired Fox and the continued date of his trial – was insufficient

to enable Fox to effectively represent him. Speculative claims, i.e., "claim[s] that

certain facts might be true . . . cannot be the basis for RCr 11.42 relief." *Mills v.*

*Commonwealth*, 170 S.W.3d 310, 328 (Ky. 2005), *overruled on other grounds by*

*Leonard*, 279 S.W.3d 151.  The trial court did not err in denying relief on this issue.

**2. "His trial counsel failed to have an individual by the name of Shelia Smothers testify at this trial."**

Justice represents that prior to his trial date his mother was told by an individual named Shelia Smothers that C.J.'s mother had coerced C.J. to falsely accuse him of sexual abuse.  Justice believes Smothers could, therefore, have been a valuable impeachment witness at his trial.  He argues he was denied effective assistance of counsel from Baylon and Fox because neither attorney interviewed or secured testimony from Smothers, and he contends the trial court erred by refusing to grant him a new trial on this basis.

We disagree.  Part of why the trial court granted Justice an evidentiary hearing was to enable him to adduce evidence supporting this claim, but at the hearing, Justice adduced no such evidence.  As the trial court summarized in its order,

> Ms. Baylon testified that [Justice] disclosed the existence of Shelia Smothers and her testimony close to trial.  [Justice] informed Ms. Baylon that she could contact Ms. Smothers through his mother, but Ms. Baylon was unable to get into contact with his mother despite numerous attempts.  [Justice] also disclosed the existence of Ms. Smothers to Mr. Fox, and Mr. Fox testified that he made multiple attempts to contact [Justice's] mother to get Ms. Smothers' contact information.  Mr. Fox testified that he was unable to locate Ms. Smothers nor was he able to get into contact

with [Justice's] mother. At the evidentiary hearing, [Justice] did not call Ms. Smothers as a witness, provide an affidavit from Ms. Smothers, nor provide any information regarding if Ms. Smothers could or would have been willing to testify on his behalf.

July 29, 2024 Order, Record II[2] at 205.

Stated otherwise, Justice offers only his speculation rather than actual proof demonstrating: (1) that his attorneys should have been able to contact Smothers – assuming she exists; or (2) that Smothers had any information that could have helped his case. As stated, speculative claims cannot be the basis for RCr 11.42 relief. Justice's failure to adduce evidence was fatal to this claim. *See King v. Commonwealth*, 408 S.W.2d 204, 205 (Ky. 1966) (explaining that absent the introduction of evidence to support an allegation made in an RCr 11.42 hearing, the issue is properly deemed to have been waived).

---

[2] The Campbell Circuit Clerk created two separate records for this case. The first ("Record I") is the record of these proceedings from before Justice's direct appeal. The second ("Record II") followed the remand from the Kentucky Supreme Court and largely encompasses Justice's RCr 11.42 proceedings.

Parenthetically, there should not have been two separate records. An RCr 11.42 proceeding is a continuation or re-opening of the same proceeding that culminated in the judgment under attack, not a different proceeding, and our appellate rules accordingly mandated only one record in this context – a point we recently discussed at length in *Lamotte v. Commonwealth*, No. 2019-CA-0559-MR, No. 2020-CA-1486-MR, 2025 WL 807670, at *3 (Ky. App. Mar. 14, 2025) (unpublished).

**3. "His trial counsel failed to obtain information and reports from the victims' schools and videos from CPS, or to hire a clinical psychologist."**

Next, Justice argues the trial court should have granted him RCr 11.42 relief because:

> [H]e wanted counsel to investigate, retrieve, and present the information and report from the victims['] school and videos from CPS where the victims was [sic] questioned numerous times and stated that no criminal activity that occurred between them and Justice. However, counsel did not investigate this evidence and didn't even question the witnesses prior to trial to see if the victims['] statements were coerced or involved improper questioning, which would have been the reasonable thing to do where this case boiled down to a credibility contest.
>
> The commonwealth response is not well taken, but the trial court may have claimed that counsel's opportunity to cross examine cured this issue, but acknowledged that it was unsure if the victim E.W. told cps worker [sic] that Justice had done nothing wrong, which was to be hashed out at the evidentiary hearing without permitting counsel to argue this issue.

Appt. Br. at 5.

For context, when Justice raised this argument below, it was part of his larger argument that his counsel should have hired a clinical psychologist to evaluate the child victims and attack the reliability of their testimonies – an additional point Justice separately raises in this appeal. We will address both of those arguments together for the sake of expedience. In its initial order partially

-13-

overruling Justice's RCr 11.42 motion, the circuit court partially disposed of these

arguments as follows:

> In certain circumstances, the requirements of due process and fundamental fairness may require that a criminal defendant be allowed to have a witness against him independently examined by a psychiatrist or psychologist. Perry v. Com., 390 S.W.3d 122, 127 (Ky. 2012). However, in this case, Defendant has failed to provide the Court with any information [of] any type of psychological or mental problems the victims may have had that resulted in their inability to tell the truth. Nor did the Defendant provide the Court with any information that the taped interviews with the victims were corrupt or that the interviewer used inappropriate interviewing techniques. Instead of providing the Court with evidence of incompetency or inappropriate interview techniques, Defendant really seems to be arguing that his defense counsel failed to attack inconsistent prior statements made by the victims. He specifically mentions an interview E.W. had with the CPS social worker. Defendant claims that during that interview E.W. told the CPS social worker that Defendant had not done anything wrong. He further asserts that Defense Counsel should have obtained reports from the victims' school to support that he had done nothing wrong. Lastly, he claims Defense Counsel failed to attack the possibility that C.J. was told how to testify by her mother.
>
> At trial, Defense Counsel did attack the credibility of C.J., E.W. and L.W.'s testimony. He asked C.J. several times during her testimony why she had not told her mom about what happened. She admitted both her mom and her dad were "scary", but she eventually felt comfortable telling her mom's boyfriend. He also asked her "did your mother tell you what to say in court?" When C.J. answered yes, counsel asked "What did she tell you?" C.J. replied, "be brave and tell the truth."

-14-

Defense counsel also attacked the credibility of E.W. Specifically he addressed the fact that she had three different interviews with a CPS social worker and during the first two interviews she did not disclose any inappropriate acts by the defendant.

Defense Counsel: "Now you went and talked to the social worker two times, and you didn't say anything at first. Right?"

E.W.: "Right."

Defense Counsel: "It wasn't until the third time that you talked to the social workers that you said something, is that right?"

E.W.: "Right."

Defense Counsel: "In the first two interviews, you said nothing ever happened, right?"

E.W.: "Right."

Thus, Counsel addressed the inconsistent statements by E.W. to cast doubt on her testimony. However, the Court will note that *at the evidentiary hearing this Court would like to know if E.W. told the CPS social worker that he had done nothing or if she just did not disclose any inappropriate actions by Defendant*.

During L.W.'s testimony, Defense Counsel questioned why she stayed silent during the inappropriate touching of her, since her mom was in the room during the touching. She claimed it happened while watching a movie in which she was very interested. School records were never discussed at trial and Defendant has failed to provide the Court with what school records he wanted or

> what makes him believe the records contained any exculpatory evidence.

*See* August 11, 2023 Order, Record II at 156-58.

With that in mind, Justice fails to show that the circuit court erred by denying his RCr 11.42 motion in these respects. The trial court properly found Justice's arguments insufficient because Justice failed to provide in his RCr 11.42 motion, as required by sections (2) and (3) of the rule, *specific facts* of which Justice had *knowledge* supporting: (a) his alleged victims were incapable of telling the truth; (b) his alleged victims were inappropriately interviewed; or (c) that his alleged victims' school records contained exculpatory evidence. The trial court properly determined that if Justice was faulting his counsel for failing to attack the alleged victims' credibility, the face of the record contradicted his argument, and Justice was accordingly precluded from relief pursuant to RCr 11.42(5).

As emphasized, the trial court also granted Justice an evidentiary hearing to address "if E.W. told the CPS social worker that he had done nothing or if she just did not disclose any inappropriate actions by Defendant." On appeal, Justice does not cite any instance where, in line with what he now asserts, the trial court refused to permit his counsel "to argue that issue" at that hearing. We have reviewed the entirety of that hearing and, to the contrary, Justice simply presented no evidence relating to that issue. Accordingly, Justice waived that issue. *See King*, 408 S.W.2d at 205. In sum, Justice's arguments lack merit.

-16-

**4. "His trial counsel failed to make various objections relating to evidence and testimony provided at his trial by 'Detective Greg Adams.'"**

On January 22, 2018, Justice was interviewed by a detective at the Campbell County Police Department (CCPD) regarding this matter. On January 21, 2020, the first day of Justice's trial, the detective testified regarding the interview, and part of the recorded interview was played for the jury at that time. Justice refers to the detective as "Greg Adams" – a name that both the Commonwealth (in its brief) and the trial court (in its orders) have unfortunately adopted. To be clear, there is no mention in the record of anyone by the name of "Greg Adams." The CCPD detective who interviewed Justice on January 22, 2018, executed Justice's arrest warrant on June 8, 2018, ultimately testified at Justice's trial, and whose testimony is quoted by the parties (in their briefs) and the trial court (in its orders) was Detective *Kyle Gray* ("Det. Gray").

In any case, Justice presents three arguments regarding Det. Gray's testimony – three arguments the trial court summarily rejected in its August 11, 2023 order, e.g., without an evidentiary hearing. First, Justice faults his counsel for not moving to have the entirety of the interview played for the jury during Det. Gray's testimony because, he asserts, parts of the interview that were not played were exculpatory. But, we agree with the trial court's summary rejection of this argument. In contravention of RCr 11.42(2) and (3), Justice does not identify the specific portions of the interview that he believes were exculpatory or explain how

-17-

they were exculpatory. It is not the responsibility of this Court to construct legal arguments on behalf of an appellant and scour the record to find where it might provide support for his claims, and we will not do so. *See Harris v. Commonwealth*, 384 S.W.3d 117, 131 (Ky. 2012).

Second, Justice faults his counsel for not seeking to exclude or request an admonition regarding part of the out-of-court interview that was played for the jury because, he asserts, during that part of the interview Det. Gray "indirectly vouched for the truthfulness of the victims' allegations, labeled Mr. Justice as a liar to the jury and persuaded the jury to prejudge Mr. Justice's guilt according to the reliability of a police officer." Appt. Br. at 21. That part of the interview involved a discussion about the allegations against Justice of sexual abuse. What Justice specifically takes issue with is emphasized below:

> JUSTICE: What I'm saying, it's not true. It's, that's something that hasn't [unintelligible] happened.
>
> GRAY: So, what I'm telling you is the evidence is absolutely overwhelming. Overwhelming. Um, this is a binder of the investigation. It's not some flimsy little report. It's a binder of stuff. There is no doubt. *The judge isn't gonna doubt it, a jury's not gonna doubt it*, *I don't doubt it*. I'm, I'll even show it to you if you want me to. I'll show you the evidence I've got.

Trial, January 21, 2020 at 4:57:13-4:57:41 p.m. (emphasis added).

Parenthetically, the trial court did not render any findings addressing this point, but it did not need to do so considering its summary rejection of this

-18-

aspect of Justice's RCr 11.42 motion. Findings of fact are only required if an evidentiary hearing is held. *See* RCr 11.42(6); *Stanford v. Commonwealth*, 854 S.W.2d 742, 743-44 (Ky. 1993). That said, we agree with Justice that an admonition would have been proper in this context. As to why, we turn to *Lanham v. Commonwealth*, 171 S.W.3d 14 (Ky. 2005). There, the Kentucky Supreme Court explained, "[I]t is generally improper for a witness to characterize the testimony of another witness as 'lying' or otherwise." *Id*. at 23. However, in the context (as here) of "non-testimonial statements made by a police officer during an interrogation of a criminal suspect as part of the overall interrogation technique," *id*.,

> Almost all of the courts that have considered the issue recognize that this form of questioning is a legitimate, effective interrogation tool. And because such comments are such an integral part of the interrogation, several courts have noted that they provide a necessary context for the defendant's responses. We agree that such recorded statements by the police during an interrogation are a legitimate, even ordinary, interrogation technique, especially when a suspect's story shifts and changes. We also agree that retaining such comments in the version of the interrogation recording played for the jury is necessary to provide a context for the answers given by the suspect.

> We also agree, however, that such comments are not admissible for the truth of the matter that they appear to assert, i.e., that the defendant is lying. We recognize that the introduction of such comments, no doubt, entails the possibility that the jury will misunderstand and

-19-

accord to those comments an impermissible weight
during deliberation.

*Id*. at 27.

> [T]he better remedy to any possible adverse inference by the jury is a limiting admonition given by the court before the playing of the recording. Our Rules of Evidence specifically provide for such an admonition. Most of the other courts that have addressed this issue have endorsed limiting admonitions either by approving the trial court's use of such an admonition or by proposing the use of such an admonition. The admonition should be phrased so as to inform the jury that the officer's comments or statements are "offered solely to provide context to the defendant's relevant responses." This means, however, that a trial court's failure to give such an admonition when requested by a defendant is error, though such an error is still subject to harmless error analysis.

*Id*. at 28 (footnotes omitted).

Consistently with *Lanham*, Justice's counsel should have requested a limiting admonition from the trial court before the recording of the interview was played for the jury because Det. Gray's statement that "The judge isn't gonna doubt [the allegations against Justice], a jury's not gonna doubt [the allegations], I don't doubt [the allegations]," attacked the credibility of Justice's denial of guilt, was not admissible for that purpose, and gave rise to a possibility that the jury could have misunderstood and accorded that comment an impermissible weight during deliberations.

As stated, Justice's counsel failed to request an admonition. We reiterate, however, that even when this type of admonition is requested by a party and refused by a trial court, any resulting error must be more than harmless to warrant reversal on direct appeal. *Id.* Similarly, for purposes of satisfying the second prong of *Strickland* and securing collateral relief through RCr 11.42, it must be demonstrated within "reasonable probability" that the outcome of the proceeding would have been different if such an admonition had been given. *See Bowling*, 981 S.W.2d at 551.

Here, while an admonition would have been proper, we do not believe that giving it would, within reasonable probability, have altered the outcome. After the statement was played, it was never played again or repeated during the remainder of Justice's four-day trial. To the extent the jury might have inferred from the statement that Det. Gray believed there was cause to believe Justice was guilty of the charges, that much could also have been inferred through Det. Gray's testimony – to which Justice raises no objection – that he presented charges against Justice months after the interview.[3] And, as discussed in more depth below, Det. Gray testified before and after that statement was played that its purpose – and the purpose of many of his other statements – was simply to elicit a response from Justice; that he is not a "truth detector"; and that Justice never admitted guilt.

---

[3] *See* Trial, January 21, 2020 at 5:24:15-5:24:24 p.m.

-21-

When considering the trial as a whole, it cannot be said that the lack of an admonition probably altered the outcome.

Third, Justice faults his counsel for not seeking an admonition for, or seeking to exclude, Det. Gray's testimony regarding inferences Det. Gray drew from what Det. Gray described as "non-disclosures which were fairly significant" that Justice made in response to certain of Det. Gray's statements during the interview. Det. Gray defined "non-disclosures" as "you don't answer yes or no, you answer a different way, all the while denying."[4] Justice specifically takes issue with Det. Gray's testimony involving: (1) an instance where Justice nodded his head forward; (2) a verbal response Justice gave to one of Det. Gray's questions; and (3) Justice's unresponsiveness (i.e., silence) to a comment Det. Gray made. We will first expound upon each of these "non-disclosures," and then discuss whether Justice's counsel's failure to object to this testimony or seek an admonition ran afoul of *Strickland*.

The first two of those "non-disclosures" are somewhat interwoven. Regarding the head nod, Det. Gray testified that less than five minutes into the interview, before he had related the allegations to Justice, he informed Justice there had been allegations of "contact" that had occurred between Justice, E.W., and

---

[4] *Id*. at 4:47:49-4:47:59 p.m.

L.W.;[5] that when Justice asked for clarification, he explained "contact" meant "touching";[6] and that "it was between that and explaining 'touching' was when I got the head nod" from Justice.[7]  Det. Gray testified the movement was a forward nod, and that from his point of view, the manner in which Justice nodded "was an indication of understanding exactly why you're there, understanding exactly what's being talked about."[8]  Det. Gray added, however, that he is not a psychologist, could not infer exactly what Justice's nod meant, and that it was "absolutely" open to interpretation what, if anything, Justice was acknowledging by nodding.[9]

This leads to the second non-disclosure, i.e., Justice's verbal response. Det. Gray testified that after explaining to Justice that the allegations involved Justice touching the girls, Justice told him, "When it comes to touching, them allegations, it's all false, I know that for a fact."[10]  Det. Gray testified that after Justice made that statement, he asked Justice, "If you didn't have anything to do

---

[5] *Id*. at 5:03:40-5:04:08 p.m.

[6] *Id*.

[7] *Id*. at 5:29:42-5:30:00 p.m.

[8] *Id*. at 5:29:34-5:29:43 p.m.

[9] *Id*. at 5:23:00-5:23:37 p.m.

[10] *Id*. at 5:22:36-5:22:42 p.m.

with this, why wouldn't you?"  According to Det. Gray, Justice then responded, "Why wouldn't I?"

On appeal, Justice argues Det. Gray's question was "misleading and easily interpreted [sic?] (if ever interpreted), and counsel should have objected to the reference that Justice [sic] answer to this question was a denial of innocence or admission of guilt."[11]  However, Justice does not cite – nor have we found – where Det. Gray testified Justice's answer of "why wouldn't I" constituted a denial of innocence or admission of guilt.  He merely testified Justice's answer "was not a no, it's not a yes, it's something different."[12]

As for how Justice's answer to Det. Gray's question might have been interpreted, we note that immediately after Det. Gray related what he'd asked Justice, the trial court found it necessary to interject and ask him for clarification. Det. Gray then explained that immediately before asking Justice, "If you didn't have anything to do with this, why wouldn't you," Justice had denied touching the children.  Elaborating further, Det. Gray explained:

> GRAY:  If you didn't have anything to do with this, *the allegations*, why wouldn't you.
>
> COMMONWEALTH:  So, you're asking someone, why wouldn't you participate in –

---

[11] Appt. Br. at 22.

[12] Trial, January 21, 2020 at 4:48:35-4:48:37 p.m.

GRAY:  Why wouldn't you do –

COMMONWEALTH:  Something with the child?

GRAY:  Correct.  Why would you not touch a child?

COMMONWEALTH:  So, that question is asked to see what kind of response you'd get?

GRAY:  Sure.  Exactly.

COMMONWEALTH:  Well, why wouldn't you do something with a child?  And his response to that "Why wouldn't you do something with a child" was?

GRAY:  "Why wouldn't I?"

Trial, January 21, 2020 at 4:48:45-4:49:13 p.m. (emphasis added).

It appears Det. Gray meant to indicate that the purpose of his question was to highlight to Justice, during the interview, that Justice had associated touching children with something negative; and that he had asked Justice that question to provoke a response from Justice regarding that point.  However, given the trial court's need for clarification regarding the question, and Det. Gray's rather unwieldy explanation, it could perhaps be more readily inferred that Justice's answer of "Why wouldn't I?" was simply an indication that Justice did not understand what Det. Gray was asking him.

Justice's third "non-disclosure" was, as stated, his silence while Det. Gray made certain comments during the interview.  Det. Gray provided the following background before playing those recorded comments for the jury:

-25-

GRAY: So, in an interview, with anybody who's a suspect, there are certain questions that we ask to gauge responses of what we think is a normal reaction to either an accusation, a question. Um, certainly not everybody is the same, but in law enforcement there are certain red flags. Um, when somebody has no emotion to an emotional topic, if, with non-denials, with several different things. And at this point, I was questioning Mr. Justice, and in interviewing people we do our best to relate to them. Um, and I had told Mr. Justice that I believed in his own way, that he was trying to show these girls an experience that wasn't hurtful, that they could learn this type of stuff from somebody that cares for them, because I wanted to gauge his reaction to that.

*See* Trial, January 21, 2020 at 4:53:44-4:54:53 p.m.

The Commonwealth then played the following part of Det. Gray's interview with Justice that included his comments:

GRAY: In your own way, you were trying to show them an experience that's not hurtful to them. I don't think it was malicious. I don't think it was sexually driven. I don't think it was, you know, tie them to a bed and raping them and throwing them in a closet and lock it, I don't think that, I don't think that at all. I think, I think that in your own way, you were trying to shelter them from having to go through the pain and suffering that you go through. I think, I think if you let it get to that point, where you're saying, "you're lying, it didn't happen," one, I think they're, all of them, are, I said, I mean, it's not my statistic, it's a bunch of doctors and statistical analysis people that, people that crunch all those numbers that say that they're more likely to kill themselves.

JUSTICE: That's a, that's an unfortunate thing to have to happen, you know, for [unintelligible] kids to die.

Trial, January 21, 2020 at 4:55:23-4:56:42 p.m.

Det. Gray later provided the following testimony regarding that portion of the interview, and why he believed it was significant:

> COMMONWEALTH:  So again, the significance of that section there is?
>
> GRAY:  Based upon my experience, I would have expected somebody to interrupt me way into me explaining touching a child for reasons that benefit the child, *I would expect somebody to stop me and tell me I'm dumb*.  There's no way that, so, that scenario was presented to him to see how he would react to being told, "this is why you did this."  And again, judging the reaction from individuals helps us gauge what, *what path of truthfulness we're on*.
>
> COMMONWEALTH:  Okay.  Alright.  And you can't tell us today, you're not a truth detector –
>
> GRAY:  No.  No, ma'am.
>
> COMMONWEALTH:  These are just techniques you use to see what their reactions are when you're investigating different kinds of cases, is that correct?
>
> GRAY:  Correct.  Yes, ma'am.

*See* Trial, January 21, 2020 at 5:01:23-5:02:24 p.m. (emphasis added).  Det. Gray then reiterated that Justice did not admit guilt at any point during their interview. *Id*. at 5:02:35-5:02:43 p.m.

Without citation to any portion of Det. Gray's testimony, Justice argues "Det. Adams [sic] stated Justice [sic] silence to question [sic] is what he would expect of an *innocent* person and he would expect Justice to 'stop him and

-27-

tell me I'm (Adams [sic]) dumb,' and that this was a tactic to determine 'what path of truthfulness we're on.'" Appt. Br. at 22 (emphasis added). But, in the testimony Justice appears to be taking issue with, Det. Gray did not use the phrase "innocent person." Det. Gray stated that based upon his experience, he expected "somebody" hearing his commentary and receiving those types of accusations would have given an emotional reaction, such as stopping him and telling him he was dumb. Moreover, while Det. Gray did testify that "judging the reaction from individuals helps us gauge what, what path of truthfulness we're on," he added that he is not a "truth detector," and that Justice never admitted wrongdoing.

Having expounded upon each of the three "non-disclosures" Justice takes issue with, we now proceed to whether Justice's counsel's failure to object to this testimony or seek an admonition ran afoul of *Strickland*. We find it did not. As to why, in *Carson v. Commonwealth*, 621 S.W.3d 443 (Ky. 2021), the Kentucky Supreme Court explained:

> Pursuant to KRE[13] 701, a lay witness may provide opinion testimony only if their opinion is (1) based on their perception; (2) helpful to a clear understanding of the witness' testimony or the determination of a fact at issue; and (3) not based on scientific, technical, or specialized knowledge. More often than not this rule permits shorthand testimony regarding certain inferences the witness drew from behavior they observed. As a result, Kentucky law permits witnesses to give opinion testimony regarding a person's apparent intoxication; the

---

[13] Kentucky Rule of Evidence.

apparent age of a person; and a person's apparent mental or emotional state. The principle connecting each of these cases is that a witness may testify as to a conclusion they drew about a person's behavior from their personal observation of certain facts.

Further, the degree to which a witness may give an opinion, of course, is predicated in part upon whether and the extent to which the witness has sufficient life experiences that would permit making a judgment as to the matter involved. Consequentially, law enforcement officers may provide lay opinion testimony as to their experience-based interpretations of certain facts which they personally observed. Pursuant to this rule, this Court has permitted law enforcement officers to testify as to their interpretation of drug-sniffing dogs behavior; that a juice bottle appeared to be a homemade silencer; and that a suspect appeared intoxicated due to his performance on a field sobriety test. But when the subject matter of the officer's opinion is either not based on personal knowledge or based on specialized knowledge, the trial court must first qualify the officer as an expert.

One area in which neither lay nor expert testimony is appropriate is the veracity of a witness. Just as we prohibit the introduction of mechanical polygraphic evidence, we similarly restrict the ability of a witness to act as a human lie detector on the stand. As such, neither expert nor lay witness may testify that another witness or a defendant is lying or faking. That determination is within the exclusive province of the jury.

*Id*. at 446-47 (internal quotation marks, footnotes, and brackets omitted).

Applying these principles, the *Carson* Court explained it would infringe upon the province of the jury if the interviewing officer effectively

testified that he could determine if the interviewee was being truthful through an analysis of the interviewee's behavior. *Id*. at 449. It added, however, that:

> [T]estimony regarding a suspect's body language is proper. Such testimony is fact-based and clearly derived from the perception of the interviewing officer. Furthermore, an investigating officer is surely permitted to testify as to his or her observations of a defendant during the interview and may even offer opinions regarding the defendant's demeanor.

*Id*. (footnote omitted).

To review, Justice takes issue with three inferences Det. Gray drew from his behavior. In Det. Gray's view: (1) it appeared Justice understood why he was at the interview and what was being talked about (based on Justice's singular head nod); (2) it appeared Justice associated "touching" with something negative (based on Justice's answer of "Why would I?"); and (3) it appeared Justice seemed cold or did not exhibit emotion when he accused Justice of engaging in disturbing conduct. But, Det. Gray's testimony and opinions were based upon his personal observations of Justice's mental and emotional state and demeanor during the interview. Particularly with respect to the third of those inferences, a police officer can properly comment on the defendant's body language and provide observations of the witness's demeanor, such as that the defendant "seemed 'cold,' or that he did not exhibit physical emotion in any way." *James v. Commonwealth*, 681 S.W.3d 60, 70 (Ky. 2023). Det. Gray also emphasized he had no specialized

-30-

training in behavioral analysis (i.e., that he was not a psychologist); he disclaimed being a human lie detector; and he emphasized that irrespective of the inferences he drew, Justice's behavior was open to interpretation, and that Justice never admitted any of the allegations.

Considering the foregoing, the inferences Det. Gray drew from Justice's behavior did not constitute impermissible opinion testimony. Moreover, considering how equivocal Det. Gray's inferences were, how brief his testimony about his inferences was, and the fact that his testimony about his inferences was not repeated or reemphasized during the remainder of Justice's four-day trial, it cannot be said that, for purposes of satisfying the second prong of *Strickland* and securing collateral relief through RCr 11.42, a "reasonable probability" existed that the outcome of the proceeding would have been different if that testimony had been excluded. *See Bowling*, 981 S.W.2d at 551. We find no merit to Justice's arguments relating to Det. Gray's testimony.

**5. "His trial counsel failed to hire a DNA expert."**

Justice argues he received deficient representation because his counsel did not secure "an expert to declare the evidence contaminated[.]" Appt. Br. at 8. "The evidence" Justice is referencing consists of the sex toys that the authorities removed from the residence he shared with E.W., L.W., T.W., and their mother, Emily. The first law enforcement officer to visit the residence regarding this

matter was Det. Renee South of the Newport Police Department. After Det. South indicated to Emily there were concerns that sex toys might have been used on one or more of the girls, and that the sex toys might constitute evidence of criminal activity, Emily provided Det. South with a dresser drawer filled with her collection, which Det. South took back to her department as evidence. At trial, Alison Tunstill, the Commonwealth's DNA expert, testified that after the sex toys were tested for DNA, E.W.'s DNA was found on three of the sex toys, i.e., a dildo, a pink vibrator, and a purple vibrator.

The "contamination" Justice is referencing stems from the fact that the sex toys were not separated from each other between when Det. South removed them from the residence until they were individually tested for DNA. During that time, all the sex toys remained in contact with each other and were packaged together. Justice's counsel did not hire a DNA expert to address this point, and Justice argues his counsel was deficient for failing to do so.

This is another argument the trial court summarily rejected, and we agree with its disposition. Under cross-examination from Justice's counsel, Tunstill conceded that the way the sex toys were collected and stored gave rise to a possibility that DNA from some of the sex toys may have rubbed off, transferred onto, and thus "contaminated" other sex toys; and that modern DNA testing could not show whether DNA was present on the sex toys due to direct contact with the

-32-

victims or because of transference from one sex toy to another. Justice fails to show how an independent DNA expert would have been able to add more than cumulative testimony about that point. Accordingly, he has failed to show how such an expert would have altered the outcome of his trial.

**6. "His trial counsel failed to hire a private investigator."**

Justice asserts "that he informed the court that his belief that [Emily] may have sent the picture could have been investigated by a private investigator, which would have resulted in the mother being charged for the conduct instead of Mr. Justice." Appt. Br. at 10. "The picture" Justice is referencing is the picture that was uploaded to the pornographic "Motherless" website, which drew the attention of authorities and ultimately played a major role in his arrest. He asserts "there is a reasonable probability of a different outcome had counsel secured an expert to discover that the image was sent to motherless[] by [Emily] on her device." *Id*. at 11.

This is another argument the trial court summarily rejected, and we agree with its disposition. Law enforcement seized sixteen electronic devices from the residence Justice shared with Emily, E.W., L.W., and T.W. These devices included cellular phones, laptop computers, and a variety of electronic tablets. Justice does not identify which of those devices he believes Emily might have used to upload the image, and in any case the picture that was uploaded to the

"Motherless" website was not discovered on any of those devices after they were forensically examined. Furthermore, Justice offers nothing to contradict the Commonwealth's trial evidence – which originated from FBI agent Michael Shafer and CCPD forensic examiner Steve Kush – that while the upload of the image was able to be traced back to the IP address registered to Justice, it was impossible to trace the upload back to any particular device. Justice provides nothing indicating how a private investigator could have disputed those points or provided any other relevant information capable of altering the outcome of his trial.

**7. "His trial counsel failed to hire an 'identification' expert."**

The image that was uploaded to the "Motherless" website, which drew the attention of authorities and ultimately played a major role in Justice's arrest, displayed the thumb and finger of an adult's right hand spreading apart a vagina. The person whose vagina was being displayed was wearing pajamas. This image was shown to Emily at trial. She testified that she recognized the pajamas as hand-me-downs that had been worn by all three of her daughters. She recognized the one wearing them as her then-two-year-old daughter, T.W. She also recognized the thumb and finger as Justice's because she was familiar with his hand and because, as she testified, Justice had a habit of biting his fingernails, and the nails on the thumb and forefinger appeared to have been bitten. Relevant to that last point, Det. South also authenticated two images of Justice taken during her

-34-

separate interview with him at the Newport Police Department which showed Justice appearing to bite his fingernails, and those images were admitted into evidence.

In his RCr 11.42 motion, Justice claimed he requested his counsel to hire an "identification expert" to evaluate (1) whether the fingers featured in the uploaded image were his fingers, and (2) whether the vagina was that of a minor child. The trial court summarily rejected the latter of those two claims – a point Justice takes issue with on appeal – but we agree with that disposition. An expert is appropriate "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" *See* KRE 702. It is enough to say that the jury was shown the image, and that we believe any rational adult without expert training or experience is capable of recognizing visual material depicting a very young child's vagina when they see it.

As for the former of those two claims, the trial court granted Justice an evidentiary hearing to determine if his counsel was ineffective for not seeking an expert to refute that Justice's hand was featured in the image. At the hearing, Justice's counsel, Fox, testified having no recollection of Justice asking him to hire any kind of "identification" expert. Apart from that, Justice did not present a hand identification expert at the hearing or present an affidavit or report from one supporting that a hand expert could have cast doubt on Emily's identification of

Justice's fingers. Absent any such evidence, Justice's speculative assertion that a hand expert could have altered the outcome of his trial is an insufficient basis for RCr 11.42 relief. *See Mills*, 170 S.W.3d at 328; *King*, 408 S.W.2d at 205.

**8. "His trial counsel failed to make an adequate directed verdict motion."**

Justice's counsel moved for a directed verdict with respect to all counts of the indictment at the close of the Commonwealth's and Justice's cases-in-chief. The motions were denied. In his RCr 11.42 motion, Justice took issue with the fact that, in his view, his counsel's directed verdict arguments were only adequate regarding "counts 1, 4, and 6, out of the nine (9) counts he faced." Record II at 76. Regarding the other counts, in the words of his motion,

> Counsel did not identify the charges or any elements that the Commonwealth failed to prove, which left these charges completely uncontested at this critical state of the proceeding.
>
> . . .
>
> Movant encourages that a review of the sufficiency of evidence was needed to ensure that all charges were to be forwarded to the jury, especially with the testimonies and evidence being all over the place. For instance, there was insufficient evidence that movant engaged in deviate sexual intercourse with C.J. and movant was not charged with sodomy which calls for deviate sexual intercourse with a minor.
>
> Also, no evidence was introduced that movant knowingly produced, directed, or promoted a performance which included sexual conduct or engaged with sexual conduct with [T.W.] But all these charges

-36-

> went uncontested by counsel in failing to properly
> motion for directed verdict by identifying the charges and
> elements not proven.

Record II at 76-77.

The trial court summarily rejected this argument. On appeal, Justice repeats it. Upon review, we find no error. Justice is arguing his trial counsel was deficient for not making *specific enough* directed verdict arguments predicated upon what he believes was the insufficiency of the Commonwealth's evidence against him. But, even if the directed verdict motion made by Justice's counsel lacked the requisite level of specificity regarding the nine counts he faced apart from counts 1, 4, and 6, the alleged insufficiency of the Commonwealth's evidence against Justice could, nevertheless, have been raised by Justice on direct appeal under the auspices of palpable error review. *See Williams v. Commonwealth*, 706 S.W.3d 177, 184-85 (Ky. 2024). If that did not occur during Justice's appeal, it is not the fault of Justice's trial counsel.

That aside, Justice offers no citations supportive of his sweeping statements and opinions about the quality of Commonwealth's evidence. It is not the responsibility of this Court to construct legal arguments on behalf of an appellant and scour the record to find where it might provide support for his claims. *See Harris*, 384 S.W.3d at 131. To the extent Justice is attempting to challenge the sufficiency of the Commonwealth's evidence relative to those other

-37-

counts under the pretense of an ostensible ineffective assistance of counsel claim –

and it appears that is exactly what Justice is attempting to do – he is also barred

from doing so. *See Leonard*, 279 S.W.3d at 158 (explaining for purposes of RCr

11.42 relief that there is a "difference between an alleged error and a separate

collateral claim of ineffective assistance of counsel related to the alleged error, and

[that] a claim of the latter may be maintained even after the former has been

addressed on direct appeal, *so long as they are actually different issues*.")

(emphasis added) (citation and footnote omitted).

**9. "His trial counsel failed to object to a variety of errors in the jury instructions (apart from what the Kentucky Supreme Court addressed during Justice's direct appeal)."**

        a. Jury instructions 7, 8, 9, 11 and 12.

        Justice claims his trial counsel was ineffective because he "failed to

object to jury instructions 7, 8, and 9, then 11 and 12, due to violation of double

jeopardy on the basis of continuing course of conduct KRS[14] 505.020(1)(c)."

Appt. Br. at 13. This is the extent of his argument regarding these instructions. It

was summarily rejected by the trial court, and we agree with the trial court's

disposition. For context, those instructions were as follows:

---

[14] Kentucky Revised Statute.

## INSTRUCTION NO. 7

You will find the Defendant guilty of Incest under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county, between the dates of January of 2015 and May of 2016 and before the finding of the Indictment herein;

B. The Defendant engaged in deviate sexual intercourse with CJ;

C. That CJ was his daughter;

D. That the Defendant knew that CJ was his daughter;

AND

E. That, when the deviate sexual intercourse occurred, CJ was less than twelve years of age.

. . .

## INSTRUCTION NO. 8

You will find the Defendant guilty of Sexual Abuse, First Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county, between the dates of January 2015 and May of 2016, and before the finding of the Indictment herein;

B. The Defendant engaged in sexual contact with CJ;

C. That the sexual contact with CJ occurred two or more times over the above listed time period;[15]

AND

D. That at the time of such contact, CJ was less than 12 years of age.

. . .

INSTRUCTION NO. 9

You will find the Defendant guilty of Attempt to Promote the Sexual Performance of a Minor under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county, between the dates of January of 2015 and May of 2016, and before the finding of the Indictment herein;

B. That under the circumstances as he believe them to be, the Defendant knowingly took a substantial step to produce, direct, or promote a performance which included sexual conduct by CJ;

AND

C. That CJ was less than 16 years of age.

. . .

---

[15] Instruction 8 – which directed the jury to resolve whether "sexual contact with CJ occurred two or more times over the above listed time period – utilized KRS 501.100, a statute the General Assembly enacted to address a persistent problem in prosecuting multiple sexual offenses committed against a young child victim, when evidence differentiating one illegal act from another is difficult to obtain. In sum, that statute permits the multiple crimes to be charged as a single "continuing course of conduct" crime. *Elam v. Commonwealth*, 500 S.W.3d 818, 826 n.8 (Ky. 2016). Justice raises no challenge to the validity of KRS 501.100.

-40-

## INSTRUCTION NO. 11

You will find the Defendant guilty of Promoting the Sexual Performance of a Minor under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county, between the dates of December of 2014 and April of 2016, and before the finding of the Indictment herein;

B. The Defendant knowingly produced, directed, or promoted a performance which included sexual conduct by TW;

AND

C. That TW was less than 16 years of age.

. . .

## INSTRUCTION NO. 12

You will find the Defendant guilty of Sexual Abuse, First Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county, between the dates of December of 2014 and April of 2016, and before the finding of the Indictment herein,

B. The Defendant engaged in sexual contact with TW;

AND

C. That, at the time of such contact, TW was less than 12 years of age.

-41-

To review, Justice's sole assertion is that these instructions violated

KRS 505.020(1)(c), which provides:

> (1) When a single course of conduct of a defendant may
> establish the commission of more than one (1) offense,
> he may be prosecuted for each such offense.  He may not,
> however, be convicted of more than one (1) offense
> when:
>
> . . .
>
> > (c) *The offense is designed to prohibit a*
> > *continuing course of conduct* and the
> > defendant's course of conduct was
> > uninterrupted by legal process, unless the
> > law expressly provides that specific periods
> > of such conduct constitute separate
> > offenses[.]

(Emphasis added.)

Considering this, and taken objectively, Justice's argument appears to

be that the offenses of incest (with respect to C.J., as outlined in Instruction 7),

sexual abuse first degree (with respect to C.J. and T.W., as outlined in Instructions

8 and 12), attempt to promote the sexual performance of a minor (with respect to

C.J., as outlined in Instruction 9), and promoting the sexual performance of a

minor (with respect to T.W., as outlined in Instruction 11) each qualified as

"offense[s] . . . designed to prohibit a continuing course of conduct" within the

meaning of KRS 505.020(1)(c); that principles of double jeopardy accordingly

-42-

made it improper for a jury to convict him of some or all of those offenses; and that his counsel was accordingly deficient for failing to press that issue at trial.

But, whether an offense is designed or intended to cover a course of conduct is a matter of statutory intent. "[I]f the text does not refer to a course of conduct and instead only refers to singular and specific acts, each offense may be charged individually." *Howard v. Commonwealth*, 496 S.W.3d 471, 477 (Ky. 2016). "The real question is whether it was the individual acts which are prohibited, or the course of action they constitute. If it is the individual acts, then each act is punishable separately, but if it is a single course of conduct, there is only one punishment." *Welborn v. Commonwealth*, 157 S.W.3d 608, 612 (Ky. 2005). That said, the statutes pertaining to incest (KRS 530.020), sexual abuse first degree (KRS 510.110), and promotion of a sexual performance of a minor (KRS 531.320) respectively provide no suggestion that they require a continuing course of conduct. Rather, each act constituting the offense under these statutes is an individual act and punishable separately. Therefore, KRS 505.020(1)(c) did not render Instructions 7, 8, 9, 11, and 12 improper, and Justice's argument in this vein, such as it is, lacks merit. *See Welborn*, 157 S.W.3d at 612.

b. Jury instruction 10.

Justice claims his trial counsel was ineffective for failing to object to jury instruction 10, which provided:

You will find the Defendant guilty of Distribution of Matter Portraying a Sexual Performance by a Minor under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

> A. That in this county, on or about June 17, 2017, and before the finding of the indictment herein,

> B. The Defendant, having knowledge of its content and character, distributed matter portraying a sexual performance by a minor.

In his RCr 11.42 motion, Justice asserted his trial counsel should have objected to this instruction because:

> [T]he instruction failed to list any victim for which the alleged crime was committed, therefore allowing the jury to convict movant under any theory of a minor being in the photograph without movant being able to challenge or cross-examine the victim. The witness it was claimed to be, stated that no picture was taken of her and was [sic] no comparison was conducted to identify any minor or confirm that it was a minor in the photograph. Just because the company had a suspicion that the photograph involved a minor, does not confirm that it was a minor.

Record II at 77-78.

The trial court summarily rejected this argument. Justice now reasserts it on appeal. We agree with the trial court's disposition. First, to the extent Justice is again arguing that an *expert* was required to discern whether the subject of the uploaded photograph was a minor, we have already addressed that point and will not do so again. Second, Justice's assertion that "[t]he witness it was claimed to be, stated that no picture was taken of her" is a misrepresentation:

-44-

T.W. was claimed to be the subject of the uploaded photograph, and T.W. did not testify. Third, we agree with the trial court's conclusion that even though T.W. was not named in instruction 10, the jury should have had a clear understanding that the instruction pertained to her. As the trial court correctly explained in its August 11, 2023 order,

> During trial, the photograph was shown to the jury, and the mother of the victim testified the image was of her daughter, T.W. There was no evidence that the photograph was of anyone other than T.W. and no evidence that any other photograph was uploaded to the Motherless website.

Record II at 161.

Stated otherwise, the evidence indicated the alleged photograph of T.W. was the *only* "matter portraying a sexual performance by a minor" that was "distributed," and that T.W. was the *only* alleged victim of that offense. Justice has not shown a reasonable probability that the outcome of the proceeding would have been different if T.W. had been specifically mentioned in instruction 10. Therefore, he is not entitled to RCr 11.42 relief relative to this point, either. *See Bowling*, 981 S.W.2d at 551.

c. Lesser-included offenses.

The jury was instructed to determine whether Justice committed among other offenses: (1) sexual abuse first degree against L.W. ("Count 3"); (2) incest against C.J. ("Count 4"); (3) sexual abuse first degree against C.J. ("Count

5"); (4) promoting the sexual performance of a minor, T.W. ("Count 8"); and (5) sexual abuse first degree of T.W. ("Count 9"). Justice contends his trial counsel was ineffective for failing to seek jury instructions for lesser included "attempt" offenses regarding those counts. What he posited to that effect in his RCr 11.42 motion was outlined, summarily rejected, and correctly resolved by the trial court (in its August 11, 2023 order) as follows:

> As to Ct. 4, Incest, Defendant alleged counsel should have requested the lesser included offense of attempted incest. Incest requires sexual intercourse or deviate sexual intercourse, KRS § 530.020. Deviate Sexual Intercourse means an act of sexual gratification involving the sex organ of one person and the mouth or anus of another. KRS § 510.010(1). At trial, C.J., Defendant's daughter testified that Defendant put his penis to her lips and made her suck him. The testimony of C.J. falls in line with the definition of deviate sexual intercourse as required for incest. Defendant makes no argument as to why attempted incest would be an appropriate instruction given the evidence.

> As to CT. 8, a defendant is guilty of promoting a sexual performance by a minor when he produces, directs, or promotes any performance which includes sexual conduct by a minor. KRS § 531.320. Sexual conduct by a minor includes, but is not limited to, intentional or willful exhibition of the child's genitals. Mattingly v. Commonwealth, 878 S.W.2d 797, 798 (Ky. Ct. App. 1993). At trial, T.W.'s mother testified that the image of an adult's hands spreading open a young girl's vagina was Defendant, Charles Justice and the girl was T.W. She recognized his hands by his habit of biting his fingernails and T.W. by the distinct pajamas she was wearing. Defendant provides no argument as to what testimony supported an instruction for attempt or how

-46-

this image would constitute an attempt at promoting the sexual performance by a minor rather than promoting a sexual performance by a minor.

Counts 3, 5, and 9 are charges of Sexual Abuse 1st degree of L.W., C.J., and T.W. respectively. Defendant argues Counsel should have requested Attempted Sexual Abuse instructions on each of the three counts. Relating to Ct. 3, L.W. testified that while watching a movie together at their home, the Defendant rubbed his finger along her genital area underneath of her clothes while they were underneath of a blanket. Ct. 5, C.J. testified that the Defendant would have his "wiener" a few inches away from her genital area. She also testified that the Defendant would touch her genitals with his finger on multiple occasions. Finally, she testified that the Defendant would touch her genitals with a sex toy. Although the first instance could constitute attempted sexual abuse, her second and third statements clearly identify actual touching taking place. Furthermore, the Kentucky Supreme Court held the jury instructions for this count did not violate double jeopardy. While T.W. did not testify, her mother testified that the image of Defendant spreading open a child's vagina was T.W. The image alone displays sexual contact as defined for KRS § 510.110. The evidence contradicts an instructing on attempted sexual abuse, and Defendant makes no argument as to how he only took a substantial step toward the commission of these crimes versus actual commission.

August 11, 2023 order, Record II at 163.

On appeal, Justice largely quotes the trial court's reasoning and expresses his nebulous, unexplained disagreement with it. This is not an argument susceptible to intelligent review.

-47-

Apart from that, and without citation to the record or any authority, Justice contends "[t]he trial court admitted that the victims [sic] testimony constituted an attempt and the victim C.J., testified that Justice [sic] penis never entered her mouth, which obviously entitled Justice to lesser included offenses had trial counsel properly requested them pursuant to RCr 9.54." Appt. Br. at 15.

This contention, which appears to be directed at the trial court's discussion of Count 4 (incest against C.J.), is a mischaracterization of the evidence and what the trial court stated about it. As the trial court correctly indicated, C.J. testified that on one occasion Justice put his penis (in her words, "the tip" of "his wiener") to her lips and "made [her] suck that. His wiener."[16] The trial court did not indicate this testimony supported an *attempt* at incest or the "deviate sexual intercourse" element of that offense. Nor for that matter would this testimony have evinced an attempt or substantial step toward – as opposed to the completed act of – deviate sexual intercourse. *See, e.g.*, *Galloway v. Commonwealth*, 424 S.W.3d 921, 924 (Ky. 2014), explaining:

> Galloway argues that, because his penis did not go
> farther than Sexton's lips and teeth, there was no
> evidence that he engaged in "deviate sexual intercourse."
> We disagree. Lips and teeth are part of "the mouth."
> Therefore, Sexton's testimony was sufficient evidence
> that there was an "act of sexual gratification involving
> the sex organs of [Galloway] and the mouth [of Sexton]."

---

[16] *See* Trial, January 22, 2020 at 3:02:22-3:02:40 p.m.

To the extent Justice's contention that "[t]he trial court admitted that the victims [sic] testimony constituted an attempt" is also Justice's insinuation that his counsel should have sought an "attempt" instruction regarding Count 5, that contention is also meritless. To be sure, the trial court did indicate that Justice's conduct, related by C.J., of placing his "wiener" a few inches away from her genital area, could have warranted an instruction for attempted sexual abuse first degree. However, Justice's failure to receive such an instruction did not prejudice the outcome of his trial. To elaborate, the instructions that were submitted to the jury did not expose Justice to criminal liability for that conduct at all because, relative to C.J., Justice was tried for sexual abuse first degree and incest, which respectively required evidence of "sexual contact" (meaning "any touching of the sexual or other intimate parts of a person . . . for the purpose of gratifying the sexual desire of either party[,]" per KRS 510.010(7)) or "deviate sexual intercourse" or "sexual intercourse" (per KRS 510.010(1) and (8)). Justice's alleged conduct of "hav[ing] his 'wiener' a few inches away from [C.J.'s] genital area" could not have been relevant to either of those offenses because it cannot be considered "touching" or "sexual intercourse." By contrast, if the jury *had* been given an "attempt" instruction, Justice *would* have been exposed to criminal liability for that conduct.

**10. "His trial counsel failed to investigate, present or hire a mitigation expert for mitigation."**

Justice's next argument relates to the sentencing phase of his trial and is multifaceted. He asserts his trial counsel was ineffective for: (1) failing to "investigate his background"; (2) failing to "allow him to testify on his own behalf for leniency"; (3) failing to "inform[] his relatives that they could testify until after jury's findings of guilt"; and (4) failing to "hire a mitigation specialist." *See* Appt. Br. at 16-17. The trial court granted Justice an evidentiary hearing to prove these points. Following the hearing, it rejected each of them in its July 29, 2024 order. We will address these points in reverse order.

With respect to his trial counsel's failure to hire a mitigation specialist, the trial court correctly noted that Justice failed to present evidence at the hearing indicating what a mitigation expert's testimony would have been or how it could have changed the outcome of his criminal proceeding. Accordingly, Justice is not entitled to RCr 11.42 relief in this regard. *See King*, 408 S.W.2d at 205.

With respect to his trial counsel's asserted failure to inform Justice's relatives that they could testify, we note that Justice included, as part of his motion for an evidentiary hearing, three exhibits respectively purporting to be: (1) a letter from Justice's sister, Samantha Morgan; (2) the printout of a text from Justice's brother, Michael Justice; and (3) a letter from Justice's grandmother, Barbara

-50-

Barrick. In these writings, the purported authors each represented they were not contacted to participate in the proceedings. However, none of these exhibits were authenticated or dated. As indicated, Justice was granted an evidentiary hearing to prove this aspect of his RCr 11.42 motion. And as the trial court correctly noted in its post-hearing order, at the hearing, Justice failed to present an affidavit or testimony of any family member or other potential witness indicating they could or would have testified on Justice's behalf, what their testimony would have been, and thus how it might have changed the outcome of Justice's criminal proceeding. Accordingly, Justice is not entitled to RCr 11.42 relief in this regard. *Id*.

With respect to his trial counsel's asserted failure to "allow him to testify on his own behalf for leniency," this argument suffers from the same flaw. Justice does not cite any evidence or part of the record supporting that his counsel prohibited him from testifying during the sentencing phase; and Justice did not elicit testimony from his trial counsel or adduce any other evidence at the evidentiary hearing supporting that his trial counsel prohibited him from testifying during the sentencing phase. It is unclear if his trial counsel even *advised* him not to testify: all that the record shows on this point, as far as we are able to discern, is that prior to the sentencing phase, the trial court asked Justice's counsel, "Did you

talk to your client about whether he wants to testify?" and Justice's counsel

responded, "Yeah.  He's not going to testify."[17]

As for Justice's assertion that his trial counsel was ineffective for

failing to "investigate his background," Justice only provides the following

elaboration:

> In the case at Bar, trial counsel was informed of Justice
> [sic] prior mental health issues that resulted in a stay a
> [sic] psychiatric center where Justice [sic] issues of
> childhood sexual abuse/molestation, and false allegations
> of improper sexual contact with one of the victim's [sic]
> in this case L.W., alcohol abuse and mental health
> diagnosis prescriptions, but for some odd reason, counsel
> admits to not providing mitigation in some cases and
> believed that no mitigation was needed in this case.

Appt. Br. at 16.

To begin, nothing of record sheds any light upon what Justice

characterizes as "false allegations of improper sexual contact with one of the

victim's [sic] in this case L.W."  Nor does Justice explain, or are we able to

discern, how that could have assisted him as mitigation evidence.  Justice also does

not explain how evidence of his alcohol abuse could have served to mitigate his

sex offenses, but he forgets that Father William Seher – who testified on his behalf

during the sentencing phase – did testify that Justice continuously struggled with

alcoholism.

---

[17] *See* Trial, January 24, 2020 at 1:04:15-1:04:20 p.m.

As for the remainder of this "background," we reiterate that Justice was provided an evidentiary hearing to prove these assertions. But at the hearing, he adduced no evidence supporting that his trial counsel was informed that he had mental health issues, or about what those mental health issues were, or that his trial counsel was informed Justice was himself a victim of childhood sexual abuse. Justice did not testify at the hearing about those or any other issues, and the record does not include any documentation from the "psychiatric center" where he might have received a mental health "diagnosis" or related his "issues of childhood sexual abuse/molestation."

The only evidence of record relating to any of those "background" issues was elicited from attorneys Baylon and Fox, the only individuals who were examined at the RCr 11.42 evidentiary hearing. Baylon testified:

> COUNSEL: Now, at any point did Mr. Justice disclose any sort of mental health issues?
>
> BAYLON: Not that I recall, but I would normally, normally I would take a note of that, so if that is reflected in my file, I would expect that to be true. But, I don't specifically remember.
>
> COUNSEL: Did he ever disclose any sort of physical, emotional, sexual abuse in the past?
>
> BAYLON: Not that I recall, but if he had, I would have noted that. I also try to note things like, sometimes, someone might bring something like that up and say that it's mitigation, and if we were contesting guilt,

-53-

> innocence, I might not think that it is a good thing to
> bring up. But I don't remember it specifically in his case.

April 17, 2024 hearing at 7:50-8:50 counter.[18] Baylon also testified she recalled Justice had disclosed to her that prior to his arrest he had been in counseling at North Key, a facility in Northern Kentucky that provides services for mental health, substance abuse, and housing issues, but that she could not recall why he had received counseling there. *Id*. at 8:52-10:59 counter. She testified Justice gave her no indication or cause for concern that he suffered from mental health issues, and that he was able to assist her in preparing his defense. *Id*. at 19:35-19:53 counter. She added that testimony at the sentencing phase about a sexual abuse perpetrator's own victimhood of sexual abuse could "cut both ways" where, as here, the perpetrator allegedly abused multiple children less than ten years of age; and that choosing not to offer such testimony would be consistent with sound trial strategy. *Id*. at 12:04-12:34 counter. Further, she recalled that based upon the facts of Justice's case, she had believed a "mitigation expert" would not have made much of a difference. *Id*. at 19:00-19:24 counter.

Fox, relevant to those "background" issues, provided the following testimony:

---

[18] "7:50-8:50 counter" is a reference to the minute-second counter on the recording of the April 17, 2024 evidentiary hearing. The recording itself does not indicate the time and date of the hearing.

COUNSEL: Did you perform any sort of mitigation investigation?

FOX: I looked at Charles' background, and Charles and I discussed some mitigating factors. I knew he had some substance abuse history that was driving a lot of the contacts he had had with the criminal justice system. His alcoholism, and that he'd been in private treatment. There were some previous allegations against him, I knew of that, so I didn't want to get into too much of those records. I did not have a mitigation specialist look at the case. Charles' position was that he didn't do any of these allegations, so we were defending him as if he's not guilty. So, it was not an issue of "you did this, but . . . ." It was a, "he didn't do this." I knew that he had some counseling that he'd been in. You know, the only real contact I had was with Father Seher, who was his point of contact outside of himself.

COUNSEL: Okay. Now, you mentioned "counseling" and his substance abuse treatment. Did Charles disclose where he received that treatment at?

FOX: He did. I don't, off the top of my head, I know that one of them was a sober living house at one point.

*Id*. at 44:02-45:30 counter.

COUNSEL: Now, is it typical practice for you to perform a mitigation investigation when a client is facing a life sentence?

FOX: It depends on the case, and it depends on what the mitigation is. In this situation, and likewise in a lot of sex cases, it's very difficult on the mitigation side because a jury, if they found the person guilty, they obviously believe the allegations. And so, now, to try to mitigate that, there's no real excuse. It's not like a substance abuse thing, so it's very difficult to try and sell mitigation to a jury in that regard. So I did not, in this

instance, perform a mitigation, get an expert in that regard. I don't know, given the way the jury verdicts came down with the sentencing, I don't know that it would've changed anything. They were pretty clear cut on the maximum and consecutive on every sentence. They imposed the maximum on each count, and they imposed the sentences, they voted, they imposed them consecutively.

COUNSEL: Did Mr. Justice, I know you hit on substance abuse. Did he disclose any sort of mental health issues?

FOX: He, I know we had discussed that he had been physically abused at one point. That was in some more discussions. There was no specific diagnosis that I knew about.

COUNSEL: Did he disclose at any point that he was in counseling at any point prior to the arrest?

FOX: Yes. I believe in the prior answer I talked about how he was in counseling, he had been in sober living.

COUNSEL: And, did you request any sort of records from the places where he received treatment?

FOX: I did not.

COUNSEL: Okay. And why is that?

FOX: I did not believe that those records would have changed or impacted the trial. The issue was whether the jury was going to believe or not believe that sexual allegations occurred. Whether there was alcohol involved or substance abuse, I did not, my strategy, I believed that was not gonna impact whether he was guilty or not guilty.

COUNSEL: Okay. And you also thought that it would not impact the penalty phase?

FOX: Correct.

*Id*. at 46:32-49:21 counter.

FOX: The issues in his past that I was aware of, substance abuse, physical abuse, that wasn't gonna negate the guilty finding.

COMMONWEALTH: And you were never provided any information about past sex, sexual abuse of the defendant may or may not have suffered?

FOX: No. I knew about past physical abuse and substance abuse.

*Id*. at 1:13:49-1:14:09 counter.

Also, Fox correctly recalled that Father William Seher was the only person who testified on Justice's behalf during the sentencing phase; that Seher testified knowing and mentoring Justice since Justice was nineteen years old; that Seher testified Justice lacked family support and struggled with alcoholism; but that Seher made no mention that Justice had been a victim of sexual abuse. *Id*. at 1:15:22-1:15:50 counter; *see also* Trial, January 24, 2020 at 1:06:44-1:10:27 p.m. (Seher testimony).

Part of why we have quoted Fox's testimony at length is to clarify a glaring inaccuracy set forth in the trial court's July 29, 2024 order: without citation to the record, and for reasons known only to itself, the trial court held that

Fox *decided* not to present evidence of Justice's victimhood of childhood sexual abuse during the sentencing phase of Justice's trial, and that his *decision* was an example of acceptable trial strategy. To be clear, nothing supports any such "decision" was made. As Fox testified, he was wholly unaware and received no information supporting that Justice *was* a victim of sexual abuse.

In summary, Justice fails to show the "background" he believes his trial counsel should have discovered (1) could have altered the outcome of his sentence, or (2) existed. As such, he is not entitled to RCr 11.42 relief in this regard.

**11. "His trial counsel failed to object to a line of questioning from the Commonwealth during voir dire."**

Next, Justice directs our attention to the following question the Commonwealth asked the venire panel during voir dire:

> COMMONWEALTH: Now, in this case, there is no physical injury to the children. No physical injury. Would anyone here automatically say, because they, there's no physical injury, we cannot prove our case? Anyone, because we're talking, you heard the allegations, right? There might be some penetration. Anyone here have an issue with the fact there may be no physical injury that the doctor's going to talk about?

Trial, January 21, 2020 at 11:35:13-11:35:50 a.m.

The trial court called the parties to the bench immediately after this question was asked and informed them it believed the Commonwealth's question was inappropriate. This exchange followed:

COURT: I know the defendant didn't object, but I'm a little worried. I mean –

COMMONWEALTH: I know. I just want to keep "automatically" –

COURT: I know, but they have no right to say –

COMMONWEALTH: Oh, I know. I just want to know if they're not gonna listen to the evidence. How about if I say –

COURT: I think that's gonna get reversed if they answer that question.

COMMONWEALTH: I, I just think that, I know we've had this discussion before.

COURT: But you aren't allowed to ask about your case.

COMMONWEALTH: Right. Right. Right.

COURT: And you are.

COMMONWEALTH: But I think I'm asking about facts that a juror may say, "I don't care what you put on, I don't care what facts you put on, I'm gonna find him not guilty." Then I'm, I think I can strike. So, I won't know that unless I ask. And if I'm asking it inartfully, is what I'm doing –

COURT: I don't know how to fix it because, I mean, you're basically saying, hey look, you know, are you gonna tell me that there's no injury, there's no rape?

And, I mean, I think that might be fair if they don't think, if they listen to the evidence –

COMMONWEALTH: Right. That's my next step. I want them to be able to listen to the evidence and make sure that they're just, if they're gonna say, "I don't care who you put on. Put God on and I won't change my mind," I think I have the right to know that. So, if they'll just listen to the evidence, is all I want them to do.

COURT: I understand. I just think the question you're asking, I'm not going to help you out –

COMMONWEALTH: I know. I know.

COURT: I just think the question you're asking is, is asking them to prejudge this case. And I can't, I mean I understand part of it is their values, their ideas, but I don't know how to help you fix it. But I just think it's an inappropriate question.

COMMONWEALTH: Well, I think that as a, I'll go back to say "as it relates to that, can everybody reserve until they hear all the evidence?"

DEFENSE COUNSEL: That's fine.

*Id*. at 11:35:58-11:37:34 a.m.

Shortly afterward, the Commonwealth asked the venire panel: "So, back to that. Is everyone comfortable with reserving any judgment on that issue until you hear all the evidence? Everyone okay with that? Alright." *Id*. at 11:37:41-11:37:56 a.m. In other words, the Commonwealth rephrased its question, and it appears the venire panel responded in the affirmative.

-60-

With the above in mind, Justice asserts the Commonwealth's question to the venire panel, prior to the trial court's interruption, invited them to "prejudge" the case. Continuing in this vein, he argues:

> [T]here can be no doubt that counsel was ineffective, deficient, and incompetent by failing to object and request a mistrial or admonition of the jury to disregard the improper conduct, when the trial judge has stopped voir dire to inform the prosecution that the questioning used by the prosecution was improper and an abuse of the purposes of voir dire questioning and that the trial court failed to acknowledge that the prosecution had asked the question and got the favorable response from the jurors, then attempted to ask again when the trial court then stopped the questioning.

Appt. Br. at 18.

The trial court summarily rejected this argument in its August 11, 2023 order. We likewise disagree that Justice is entitled to RCr 11.42 relief due to this issue, and for two reasons. First, the only line of questioning Justice takes issue with was the line of questioning that occurred before – not after – the trial court interjected. Having reviewed the record, we, like the trial court, see no indication that the Commonwealth exacted any promise from the venire panel in response to that line of questioning before the trial court stopped it. Accordingly, as the trial court indicated in its August 11, 2023 order, Justice cannot show prejudice resulted from that line of questioning.

Second, we disagree that it was an improper line of questioning.

When there is uncertainty about the impartiality of a prospective juror, or whether a juror can conform his or her views to the requirements of the law, "that juror should be stricken" by the trial court. *See Moulder v. Commonwealth*, 681 S.W.3d 49, 52 (Ky. 2023); *see also* RCr 9.36(1). Ascertaining whether a prospective juror is impartial and willing to conform their views to the requirements of the law is the purpose of voir dire. *Shegog v. Commonwealth*, 142 S.W.3d 101, 110 (Ky. 2004). During that phase, the parties ask questions of the prospective jurors, which "should be as varied and elaborated as the circumstances require, the purpose being to obtain a fair and impartial jury whose minds are free and clear from all interest, bias or prejudice which might prevent their finding a just and true verdict." *Ward v. Commonwealth*, 695 S.W.2d 404, 407 (Ky. 1985). Regarding those questions, the trial court must allow inquiry "into the critical facts of the case during voir dire, where 'critical facts' are those with a substantial potential for disqualifying bias." 50A C.J.S. *Juries* § 487 (Mar. 2026 update) (footnotes omitted). Otherwise, biased jurors "could respond affirmatively, personally confident that [their] dogmatic views are fair and impartial, while leaving the specific concern unprobed." *Morgan v. Illinois*, 504 U.S. 719, 735, 112 S. Ct. 2222, 2233, 119 L. Ed. 2d 492 (1992).

On the other hand, "questions are not competent when their evident purpose is to have jurors indicate in advance or commit themselves to certain ideas

and views upon final submission of the case to them." *Ward*, 695 S.W.2d at 407.

Illustrating that point, in *Ward*, the Kentucky Supreme Court found that the trial

court did not abuse its discretion by disallowing the defendant from asking the

venire panel if they could determine that the testimony of a witness for the

Commonwealth was less credible because the witness made a deal with the

Commonwealth in exchange for testifying. The defendant "went so far as to say to

the jury, 'You have a right as a jury, if you are selected as a juror, to hold those

deals against the Commonwealth.'" *Id*. at 407. Similarly, in *Woodall v.

Commonwealth*, 63 S.W.3d 104 (Ky. 2001), the Court held the trial court did not

abuse its discretion by limiting the defendant's voir dire questioning on mitigating

circumstances. "Woodall was trying to get jurors to indicate in advance what their

views were regarding his I.Q. of 74. He was seeking to oblige jurors to commit

themselves by either accepting a specific mitigator or rejecting it before any

evidence was heard." *Id*. at 116. The Kentucky Supreme Court later explained

that the questioning in these two cases was improper because it directly implicated

the proof that would be put on at trial and asked the jurors to commit in advance to

a view of the evidence that would govern upon final submission of the case.

*Newcomb v. Commonwealth*, 410 S.W.3d 63, 86-88 (Ky. 2013).

Here, the question posed by the Commonwealth essentially asked

whether any prospective juror would automatically conclude that it did not carry its

burden of proof if it produced no evidence that the children were physically injured. To the extent the Commonwealth was asking the jurors to commit in advance to a view of the evidence that would govern upon final submission of the case, the Commonwealth was not asking the jurors to make an *improper* commitment. Furthermore, unlike the defendants in *Ward* and *Woodall*, the Commonwealth was not inviting the prospective jurors to prejudge some aspect of the case, or attempting to predispose them to react a certain way to anticipated evidence. The question is most reasonably viewed as an attempt to probe, and included only those facts necessary to test, whether any prospective juror *already held* a fixed opinion about what the result should be, assuming a critical fact in the case, i.e., that there was no physical evidence that Justice had sexually abused any of the alleged victims.

To that point, the jurors were ultimately entitled to disbelieve the Commonwealth's evidence against Justice; and in assessing the credibility of the Commonwealth's evidence, they were ultimately entitled to consider any dearth of physical injury evidence. The Commonwealth did not tell them otherwise. But, if a potential juror stated that he or she would automatically disbelieve a witness for the Commonwealth who had not yet testified or other evidence that the Commonwealth had not yet produced based solely upon the fact that there existed no evidence of physical injury, that potential juror: (1) would be incapable of

conforming their views to the requirements of Kentucky law, which did not require the Commonwealth to adduce such evidence to secure a conviction in this matter;[19] and (2) would be incapable of impartially judging the credibility of *any* of the evidence that the Commonwealth otherwise produced. In short, Justice's counsel was also not ineffective by failing to object or seek an admonition regarding the Commonwealth's question because the Commonwealth had the right to ask it. The question was a legitimate means of ascertaining juror prejudice.

**12. "His trial counsel failed to object to testimony provided by Drs. Anderson and Segal."**

Justice argues his counsel was ineffective for failing to object to hearsay related by Dr. Jacqueline Anderson and Dr. Robert Segal during their trial testimony. In summary, Dr. Anderson conducted a physical examination of E.W. on June 11, 2018, and Dr. Segal conducted a physical examination of C.J. on November 30, 2017. Both doctors authored written reports of their findings, which they related at trial. Based on those physical examinations, neither doctor could determine or found any indications supporting that C.J. or E.W. had been abused by Justice. However, Dr. Anderson was informed that E.W. claimed to have been sexually abused by Justice; Dr. Segal was informed that C.J. claimed to have been

---

[19] *See, e.g.*, *Commonwealth v. Suttles*, 80 S.W.3d 424, 426 (Ky. 2002) ("The testimony of even a single witness is sufficient to support a finding of guilt, even when other witnesses testified to the contrary, if after consideration of all of the evidence, the finder of fact assigns greater weight to that evidence.") (citation omitted).

sexually abused by Justice; and Drs. Anderson and Segal noted each girl's claims in their respective reports. On one occasion while testifying about her report, and without objection from Justice's counsel, Dr. Anderson briefly related E.W.'s claim as follows:

> ANDERSON: I was seeing [E.W.] after she disclosed during a forensic interview that she had been touched, genital to genital contact, by her stepfather.
>
> COMMONWEALTH: Okay. Alright. And were you told anything else about, besides genital to genital?
>
> ANDERSON: So, can I read what I wrote?
>
> COMMONWEALTH: Yes.
>
> ANDERSON: Okay. So, I wrote disclosure during forensic interview included stepfather touched her inside her clothing, on her private parts, with his hands. Also, it was reported he placed his private, private place on her private place. And then there was a disclosure that I wrote, that was told to me, by the stepsister[20] about being instructed on how to use sex toys.

Trial, January 21, 2020 at 3:02:38-3:03:24 p.m. Thereafter, on one occasion while testifying about his report, and without objection from Justice's counsel, Dr. Segal briefly related C.J.'s claim, stating:

> SEGAL: So, the history that was given to me by the social worker was that allegedly [C.J.'s] natural father tried to touch her vagina, and that she was asked to play

---

[20] We infer Dr. Anderson's reference to "the stepsister" was a reference to E.W. Dr. Anderson gave no indication that she communicated with E.W. or any other victims apart from C.J.

> with sex toys under her father's direction. She also gave
> a history suggestive of oral-penile contact.

Trial, January 22, 2020 at 10:48:53-10:49:17 a.m. Afterward, C.J.'s and E.W.'s respective claims were redacted from the doctors' reports, and the reports were admitted into evidence.

Justice took issue with these hearsay statements during his direct appeal, but because his counsel had not objected to them, Justice could only argue in his appeal that their admission into evidence had resulted in palpable error. Upon review, the Kentucky Supreme Court agreed it was error for the statements to be admitted as evidence, but disagreed the error was palpable. *See Justice*, 636 S.W.3d at 414-15. Afterward, for purposes of securing RCr 11.42 relief, Justice argued that if his trial counsel had preserved the issue, the outcome of his criminal proceedings probably would have been different because, in his view, it would have been grounds for reversal under ordinary standards of appellate review.

One of the reasons the trial court granted Justice an RCr 11.42 evidentiary hearing was to permit him to explore this argument with his trial counsel, who testified. The trial court later rejected this argument in its July 29, 2024 order. On appeal, Justice now makes two contentions regarding the hearsay related by Drs. Anderson and Segal. First, he asserts that his trial counsel's decision to not object to this hearsay was simply an error and cannot be deemed "sound trial strategy." And, we agree with that point. In the words of the

Kentucky Supreme Court on that very subject: "The error here is clear. The testimony identifying the alleged perpetrator in this trial was in no way related or needed to explain why the doctors were seeing or treating E.W. and C.J." *Justice*, 636 S.W.3d at 414-15 (footnotes omitted).

Second, Justice asserts this error warrants RCr 11.42 relief because it "was confirmed to be prejudicial by the Kentucky Supreme Court." Appt. Br. at 20. That is the full substance of his contention. It appears Justice is referring to the following language from the Kentucky Supreme Court:

> [W]e find palpable error did not occur. In *Hoff v. Commonwealth*, [394 S.W.3d 368 (Ky. 2011),] we found reversible error occurred when a doctor's testimony revealed to the jury that the victim had identified Hoff as her abuser and went on to describe many details of the abuse. For example, the doctor told the jury that the victim had identified Hoff as the perpetrator, had told her teacher about the abuse, and had written about it in her diary. The doctor also relayed information about Hoff taking the victim to meet an unnamed man. Further, an unredacted version of the doctor's medical report went back with the jury. We find the circumstances here to be different from those in Hoff. While both E.W. and C.J.'s doctor told the jury that the children had identified Justice as their abuser, each child also testified at trial to the same thing. Additionally, the reports that the jury saw during their deliberations were redacted so that they did not say the children had identified Justice as the person who had abused them. Justice argues the identifying statements *prejudicially* bolstered E.W. and C.J.'s testimony, which is *likely* true. But *while some prejudice may have resulted*, we do not find it to be of the egregious nature that shocks the conscience.

*Justice*, 636 S.W.3d at 415 (emphasis added) (footnotes omitted).

To be clear, the Kentucky Supreme Court did not "confirm" the admission of these hearsay statements "to be prejudicial." It explained in equivocal *dicta* that "some prejudice may have resulted" from these statements to the extent they "likely" bolstered E.W.'s and C.J.'s testimony. *Id.* Furthermore, "some prejudice may have resulted" is not the standard for determining whether, even under ordinary metrics of appellate review, reversible error occurred. *See* CR 61.01 and CR 61.02

The important question for purposes of this collateral proceeding is whether Justice demonstrated a "reasonable probability" that the outcome of the proceeding would have been different, but for his trial counsel's mistake. *Bowling*, 981 S.W.2d at 687. Here, we agree with the trial court that Justice has failed to do so. What we have set forth above is the limited scope of the objectionable hearsay related by Drs. Anderson and Segal. After these statements were related, neither doctor commented upon the credibility of those statements, they were not repeated at any point during the remainder of the four-day trial, and they were redacted from the doctors' reports. And, after relating these statements, both doctors repeatedly acknowledged their examinations of the girls could not confirm any abuse had occurred.

Furthermore, C.J. and E.W., who made those hearsay claims, testified at trial and at length; they were subjected to rigorous cross-examination from Justice's counsel, Fox; and, to paraphrase the testimony that Fox provided at the RCr 11.42 hearing, this was not a "whodunnit" case. C.J., E.W., *and* L.W. (the victims capable of recalling what had occurred because T.W. was two years old at the time) each identified Justice, and only Justice, as the perpetrator. Considering the brevity of the objectionable hearsay, the brevity of the doctors' discussions of it during their testimony, and its arguably cumulative nature, we cannot find that, within reasonable probability, the outcome of Justice's criminal proceeding would have been different if his counsel had objected to the hearsay statements. *See Bowling*, 981 S.W.2d at 551.

**13. "His trial counsel failed to object to "vouching" testimony provided by E.W.'s, L.W.'s and T.W.'s mother, Emily."**

Justice asserts his trial counsel was ineffective for failing to object to "vouching" testimony the Commonwealth elicited from Emily, the mother of E.W., L.W., and T.W. We have emphasized the offending testimony below:

> COMMONWEALTH: When law enforcement came, you gave them some electronic devices, is that correct?
>
> EMILY: Yes, ma'am.
>
> COMMONWEALTH: Okay. Did Charles Justice also have other cell phones that you would not have had?
>
> EMILY: Correct.

COMMONWEALTH:  Do you, I don't know if you would recognize them.  I'll just ask you.  Would you know what his cell phones were?

EMILY:  We, we, we had so many come in and out of the house that I couldn't –

COMMONWEALTH:  Tell for sure?

EMILY:  Couldn't tell.  Like, I have seen all of these.  I just don't know who, when, or where.

COMMONWEALTH:  Okay.  Fair enough.  And also, I'll have you look at this one, it's a little bit broken up.  Is that, is that the same thing, as far as –

EMILY:  Um, I believe this is the one he left out of the house with.

COMMONWEALTH:  Okay.  Um, if, if, um.  Did you give law enforcement all the items, except –

EMILY:  Yeah, everything I could, I gave them.

COMMONWEALTH:  Alright.  So, *if law enforcement said they collected this somewhere else*, would they be cor– would they, *would you rely upon that*?

EMILY:  Um, I mean, I know they collected stuff from me, I know they collected stuff from him, I don't know who else they collected stuff from, so *yeah, I'd say that's correct*.

COMMONWEALTH:  Thank you.  Alright.

Trial, January 22, 2020 at 5:07:51-5:09:25 p.m. (emphasis added).

There are two parts to why Justice takes issue with the language italicized above. First, as indicated, he believes it can be interpreted to mean that Emily was "vouching for the truthfulness and credibility" of law enforcement. Appt. Br. at 22. In support, he notes that in its August 11, 2023 order, the trial court stated in reference to what is set forth above – and without any elaboration – that "[t]his testimony could be considered bolstering." He also notes that because of that "finding," the trial court granted him an evidentiary hearing.

However, the trial court's unexplained "finding" regarding its interpretation of this undisputed testimony is entitled to no deference from this Court because it is nothing more than a legal conclusion. It is also not a sound interpretation of Emily's testimony. As the substance of the exchange tends to indicate, the Commonwealth was asking Emily if she could recognize certain electronic devices and cell phones, and it was showing her pictures while doing so. The Commonwealth did not specifically delineate during the above exchange which exhibit the "a little bit broken up" item was (e.g., the "this" in the phrases, "if law enforcement said they collected *this* somewhere else . . . would you rely upon that?" and "Um, I believe *this* is the one [Justice] left out of the house with"), but the Commonwealth's exhibits included several pictures of cell phones, one of which – Exhibit 45 – featured a black and copper-colored Android cell phone that is webbed with cracks and chipped (e.g., "a little bit broken up") at the bottom. It

-72-

can be reasonably inferred that "this," as used in both quoted phrases, was a reference to that cell phone.

Emily testified she recognized the "a little bit broken up" item. She testified she believed that when Justice left the house and never returned afterward, he took the "a little bit broken up" item with him. Thus, when she said, "yeah, I'd say that's correct," in response to the Commonwealth's question, "So, if law enforcement said they collected this somewhere else, would they be cor– would they, would you rely upon that?" she was not indicating her belief that law enforcement was generally truthful and credible. Emily was indicating she had no reason to believe law enforcement had obtained the "a little bit broken up" item from *her* because, to the best of her recollection, Justice had taken that item with him when he left the house and never returned.

Justice does not contest that the item Emily was discussing with the Commonwealth belonged to him, nor did he do so at the RCr 11.42 hearing. He does not argue that Emily was incorrect to believe that he took that item with him when he left the house and never returned, nor did he do so at the RCr 11.42 hearing. Attorney Fox, at the RCr 11.42 hearing, testified he did not believe that testimony was bolstering. And, as stated, Emily's testimony was *not* bolstering. Accordingly, Justice provides no rational support for why his counsel should have

objected to Emily's testimony set forth above, or how his counsel's failure to do so prejudiced his case.

As to the second part of why Justice takes issue with the language italicized above, it continues to build upon his (incorrect) contention that Emily's testimony *was* bolstering.  In the nebulous words of his brief:

> [T]he prosecution specifically asked this witness, "if law enforcement said they collected this (evidence) somewhere else, would you believe them?"  The witness responded, "yes" not realizing that the prosecution was contradicting this witness [sic] very own statement that the official who collected the bag of sex toys was the one who improperly handled (toys), because the official stated that this witness was the person who bagged (toys) up.  VR [Video Record] 01-22-20, 05:09:18-05:09:25 pm.
>
> The commonwealth confessed that the prosecution [sic] line of questioning was an attempt to clarify inconsistent testimony regarding the initial collection [sic] sex toys from this witness Emily's house, but possibly claims this was not a request for the witness to vouch for truthfulness as its response is hard to deciefer [sic].
>
> The trial court conceded that the prosecutions [sic] questioning could be considered bolstering, which the Court took into consideration the weight of the failure to object.  TR [Trial Record] 166.  However, the trial court interpreted the questioning differently than presented by Justice, pg. 209, but the fact remains that counsel failed to object to the improper questioning, which had a substantial effect on the proceedings as the prosecution was deflecting blame from officials who may have improperly collected the evidence to paint a picture for the jury that any issue with contamination, was at the

> fault of the victim's mother and should not have an effect on the evidence.
>
> Mr. Justice contends that trial counsel was ineffective, once again, for failing to object to the bolstering and vouching for the credibility of another witness, who was law enforcement, and but for counsel's ineffectiveness, there is a reasonable probability that he trial court would have sustained the objection and granted a mistrial or admonition of the jury to disregard.

Appt. Br. at 22-23.

From what can be deciphered from this, Justice appears to be arguing that because (in his incorrect view) Emily generally vouched for the truthfulness and credibility of law enforcement regarding a *cell phone*, she effectively contradicted testimony she might have previously given that law enforcement – not she – had collected the *sex toys* in her home and placed them together in a bag; and that this contradiction could have caused jurors to infer that Emily – not law enforcement – was *responsible* for the resulting possibility that E.W.'s DNA, which was discovered on some of the sex toys, might have only been on some of the sex toys due to contamination rather than due to the use of them on E.W.

With that said, this argument immediately falls flat because, again, Emily did *not* vouch for the truthfulness and credibility of law enforcement. Furthermore, Justice does not explain – nor are we willing to speculate – how it would have changed the outcome of his criminal proceedings if the jurors had been given less reason to believe that Emily, rather than law enforcement, was

-75-

*responsible* for bagging up the sex toys. *Who* bagged them up was of little if any relevance. It was the potential for DNA contamination on the sex toys *because* they were bagged up together that was relevant, and that was an issue Justice's counsel continuously underscored throughout the trial. We affirm the trial court's ultimate determination that Justice's contentions regarding Emily's testimony warranted no RCr 11.42 relief.

**14. "His trial counsel failed to object to a 'golden rule' argument from the Commonwealth during its closing arguments in the sentencing phase of his trial."**

Justice argues his trial counsel was ineffective for failing to object and request an admonition regarding a "golden rule" argument he asserts the Commonwealth made during its closing arguments at the sentencing phase of his trial. The offending statement was as follows:

> Think about it. You've been abused by your father, stepfather, whatever, and you want to have your first romantic relationship. You find someone you love, you care about, and you want to have sex. And what flashes in front of your head? Someone touching you the same way as your dad or stepfather touched you? I think it's pretty tough to go on, from what has happened to these kids.

Trial, January 24, 2020 at 2:46:29-2:46:58 p.m.

A "golden rule" argument is "one in which the prosecutor asks the jurors to imagine themselves or someone they care about in the position of the crime victim." *Caudill v. Commonwealth*, 120 S.W.3d 635, 675 (Ky. 2003)

-76-

(emphasis added) (citation omitted). The Kentucky Supreme Court has held that a "golden rule argument" that serves to "cajole or coerce a jury to reach a verdict" is erroneous. *Lycans v. Commonwealth*, 562 S.W.2d 303, 306 (Ky. 1978). The argument is particularly prejudicial when it is "repeated and reiterated in colorful variety[,]" whereas "[a]n isolated instance of improper argument . . . will seldom be found prejudicial." *Stanley v. Ellegood*, 382 S.W.2d 572, 575 (Ky. 1964) (citations omitted). The prejudicial effect of a "golden-rule argument" must be assessed on a case-by-case basis. *Id*. at 575.

Here, the trial court found that the statement set forth above qualified as a golden rule argument, and we agree with that determination. Nevertheless, the trial court denied Justice RCr 11.42 relief because it further determined that Justice failed to establish his counsel's failure to object caused him prejudice serious enough to deprive him of a fair trial. Justice argues the trial court erred regarding that latter determination, but he offers no elaboration on that point; and in any case, we agree with the trial court's conclusion.

To explain, we turn to *Lycans*. There, the prosecutor made the following remark in his closing statement of a trial involving the brutal robbery of a store clerk: "They almost beat him to death and left his eye laying out on his cheek and left him laying there handcuffed, bleeding all over. Suppose that you run a store and somebody comes in on you and does that to you. What's it worth?"

-77-

562 S.W.2d at 305. Despite the erroneous nature of the statement, the Kentucky Supreme Court concluded that the remarks did not significantly prejudice the defendant or warrant a new trial because the argument was short, and "[o]ther than for this one offhand remark," the remainder of the Commonwealth's arguments were "wholly within the bounds of propriety." *Id.* at 306.

The *Lycans* statement graphically recalled the details of the crime itself and asked the jurors to imagine themselves being subjected to it. By contrast, the Commonwealth's offending statements here did not ask the jury to imagine being graphically subjected to the charged offenses; they asked the jurors to relate to the embarrassment the girls might feel about the abuse later in their lives. As in *Lycans*, the Commonwealth's statement was not repeated or reiterated, but isolated; and, as discussed in further depth below, the remainder of the Commonwealth's closing arguments stayed within proper bounds. While the Commonwealth's "golden rule" argument was erroneous, we cannot say that it was more prejudicial than the *Lycans* statement or otherwise substantially affected Justice's right to a fair trial.

**15. "His trial counsel failed to object to a "golden rule" argument and the display of a picture during the Commonwealth's closing arguments in the guilt phase of his trial."**

Justice argues his trial counsel was ineffective for failing to object and request an admonition regarding a different "golden rule" argument he asserts the

Commonwealth made, this time during its closing arguments at the guilt phase of his trial.  He also argues that a picture the Commonwealth displayed to the jury during its "golden rule" argument was unduly prejudicial and inflammatory.  The facts relevant to his argument are as follows.  During its closing arguments at the guilt phase of the trial, the Commonwealth showed the jury a picture which had been admitted into evidence (Commonwealth's Exhibit 55) that featured C.J., E.W., L.W., and T.W., respectively wearing shorts and T-shirts and sitting together on a concrete walkway, and T.W. smiling for the camera.  The Commonwealth then said:

> When you go back and deliberate, I want you to remember who we're talking about here.  I want you to remember these girls and think about, Emily . . . told you how old they were when this picture was taken.  She told you the picture was around Spring of 2015.  So, this is what they looked like when the abuse started by the defendant.  We have [L.W.], who at that time, well, 2015, later in the year, turned five.  We have little [T.W.] who turned two in 2015, in April.  We have [C.J.], who turned seven that year in April.  And we have [E.W.], who turned seven that year in March.  This is who he was touching.  And when you go back there and deliberate, I want you to think about that.  I want you to think about it from their perspective as those young children, what they saw, what they remember.  Do not forget that.  This is who he was touching and the ages they were at.

Trial, January 24, 2020 at 10:54:49-10:56:09 a.m.

Regarding Justice's argument that the Commonwealth's statements constituted a "golden rule" argument, we disagree.  To reiterate, a "golden rule"

argument "urges the jurors collectively or singularly to place themselves or members of their families or friends in the place of the person who has been offended and to render a verdict as if they or either of them or a member of their families or friends was similarly situated." *Lycans*, 562 S.W.2d at 305. In *Caudill*, 120 S.W.3d 635, the Commonwealth made the following remarks:

> What must she have been thinking that night, this seventy-three-year-old woman, by herself, basically afraid anyway? What panic she must have felt confronted by this woman and this stranger at three o'clock in the morning.

*Id*. at 675. Applying the *Lycans* definition, the Kentucky Supreme Court held in *Caudill* that this was not a "golden rule" argument because it contained no request for the jurors to imagine themselves or someone they care about in the victim's position. *Id*.

Here, the Commonwealth's statements were in the same vein as those made in *Caudill*. They asked the jury to imagine what the victims' lives were like and to imagine the victims' perspectives. The statements never asked the jury to render a verdict as though the crime was against themselves or a close loved one; nor did they ask the jurors to imagine any facts that were not in evidence and to create a hypothetical situation. No "golden rule" violation occurred.

Regarding Justice's argument that the picture of the girls that the Commonwealth displayed to the jury was unduly prejudicial and inflammatory, Justice cites no supportive authority; and in any case, we disagree. In general,

> The rule prohibiting the exhibition of inflammatory evidence to a jury does not preclude the revelation of the true facts surrounding the commission of a crime when these facts are relevant and necessary. Were the rule otherwise, the state would be precluded from proving the commission of a crime that is by nature heinous and repulsive.

*Salisbury v. Commonwealth*, 417 S.W.2d 244, 246 (Ky. 1967).

Justice's contention regarding the picture is meritless for at least two reasons. First, it effectively turns this rule on its head. He is essentially arguing that because the natures of his charged offenses were heinous and repulsive, the Commonwealth should have been precluded from displaying an innocuous picture that revealed true and relevant facts surrounding the commission of those offenses, namely, facts illustrating who his alleged victims were and – of particular relevance to Justice's age-based offenses – how old they were during that time frame. Second, the picture had already been admitted into evidence (during Emily's testimony); Justice makes no argument that the picture should not have been so admitted; and because it was admitted, the jury would have had the picture with them during their deliberations anyway. In summary, the trial court correctly rejected these arguments.

**16. "His trial counsel failed to object to the Commonwealth's 'misstatement of DNA evidence' during its closing arguments in the guilt phase of his trial."**

Justice presents another argument that the trial court summarily rejected in its August 11, 2023 order. Without citation to any footage from the trial record, he contends:

> During closing arguments, the prosecutor misstated the evidence. Justice asserts that trial counsel was ineffective for failing to object to the prosecution statements that "DNA was on the sex toy because Justice inserted the toy in (E.W.) vagina," after defense counsel stated during closing that (E.W.) said (Justice) never took a picture and she never touched sex toys.

Appt. Br. at 25.

The trial court determined this argument warranted no RCr 11.42 relief because the face of the record demonstrated the Commonwealth's offending statements were nothing more than reasonable inferences drawn from the trial evidence. We also agree with the trial court's conclusion. That said, understanding Justice's argument requires substantial context. Thus, before discussing the Commonwealth's statements, we will summarize the evidence that Justice believes was misstated. It was largely adduced during the trial testimony of four witnesses: Alison Tunstill, C.J., Emily, and E.W.

The Commonwealth's DNA expert, Alison Tunstill, testified that among the sex toys that the authorities had taken from the house Justice shared with the victims, E.W. was a contributor to the major DNA profiles discovered on:

(1) the shaft and base of a dildo; (2) the tip of a purple vibrator; and (3) the tip of a pink vibrator. Tunstill also testified that at least three individuals had contributed DNA to an orange anal plug; that none of the victims could be considered contributors to the major DNA profile discovered on the plug; but, that being excluded as a contributor to a major DNA profile did not mean that a given individual contributed zero DNA – it only meant that the DNA contributed beyond the major profile was too insufficient to make a comparison.[21] Tunstill acknowledged, however, that she could not determine how long the DNA had been on the items, or how it had come to be on any of the items; and that it was possible for DNA on one sex toy to rub off onto (e.g., "contaminate") another sex toy if, as the case was here, all of the sex toys were packaged together in the same container.[22]

The next witness who provided testimony relevant to the Commonwealth's offending comments was C.J. C.J. testified that she, E.W., and Justice were alone together in Justice's room on more than one occasion, and that during those times, Justice would show them the sex toys, tell them to "use" the toys by "putting them up in there" (indicating the vagina), would then ask them to use the toys, and that E.W. would acquiesce. When C.J. was presented with a

---

[21] *See* Trial, January 22, 2020 at 3:54:00-4:14:00 p.m.

[22] *See id*. at 4:15:00-4:17:05 p.m.

picture of the sex toy collection that authorities had removed from the house, C.J. indicated that when she was with Justice and E.W. on those occasions, Justice would tell E.W. to use the dildo and the orange anal plug; and that she only witnessed E.W. use the orange anal plug.[23]

Next, Emily, E.W.'s mother, was presented with a pair of images that forensic examiners had extracted from one of Justice's electronic devices, and Emily testified she recognized what it depicted:

> EMILY: From looking at the picture before and still looking at the picture, it looks like one of my sex toys is being touched to my daughter.
>
> . . .
>
> COMMONWEALTH: When you say "one of your dildos," was that dildo still in existence when law enforcement collected all the dildos?
>
> EMILY: No. It had quit working and had previously been gotten rid of.
>
> COMMONWEALTH: Okay. And what made you think, was there any other reason besides the sheets that you thought it was [E.W.]?
>
> EMILY: I mean, looking at the pictures, the darker crease in the leg, um, [E.W.]'s got dark complected skin, she's got the dark creases in her legs, in her elbows, in her armpits. Like, I can tell. Like, I'm her mom. I've been bathing her every day since she was born.

---

[23] *See id.* at 2:06:00-2:16:00 p.m.

*Id*. at 5:00:07-5:01:20 p.m.

Lastly, E.W. indicated that on more than one occasion Justice had touched her vagina, both over and under her clothes, with his hands and penis. She could not remember specifics, but she testified C.J. was not with her on those occasions. E.W. further testified:

COMMONWEALTH: Did you ever see [Justice] do anything else with anything?

E.W.: No.

COMMONWEALTH: Okay. Did you ever see him with any toys?

E.W.: Yes.

COMMONWEALTH: Okay. What kind of toys did you see him with?

E.W.: I don't want to say it.

COMMONWEALTH: Okay. And when you don't want to say it, can you tell me a little bit about where you saw it?

E.W.: I don't really know.

COMMONWEALTH: Like, in what room or what house? Do you remember which house you were in?

E.W.: That one.

COMMONWEALTH: And, when you saw the toy, what did, what did he say about the toy?

E.W.: Not really anything.

-85-

COMMONWEALTH: Okay.  Did you see anybody else with the toy?

E.W.:  No.

COMMONWEALTH: Okay.  Did you see him, um. What, did he say anything about the toy to you?

E.W.:  Not really.

COMMONWEALTH: Okay.  And when you talk about the toy, can you describe it?  You don't have to say what it is.  Can you just tell us what it looked like?

E.W.:  No.

COMMONWEALTH: Okay.  Is it no because you don't remember, or no, you don't want to talk about it?

E.W.:  No, I don't want to talk about it.

COMMONWEALTH: No, you don't want to talk about it.  Okay.  I understand that.  Can you draw a picture of it and not have to say anything?

E.W.:  No.

COMMONWEALTH: Okay.  Is it a toy that kids are supposed to use?

E.W.:  No.

COMMONWEALTH: Alright.  And, um, did he bring the toy, or did you bring the toy?

E.W.:  He did.

COMMONWEALTH: He did.  Alright.  So, he brought the toy.  Did he, what did he do with it?  Did he talk to you about it?

E.W.: Yes.

COMMONWEALTH: Okay. When he talked to you about it, what was he saying:

E.W.: I can't really remember that part.

COMMONWEALTH: Okay. Did you play with the toy?

E.W.: No.

COMMONWEALTH: Okay. Um, when, was it a toy or toys? I said one or two.

E.W.: More than one.

COMMONWEALTH: More than one? Okay. Do you remember the colors or anything about them?

E.W.: Not really.

COMMONWEALTH: And when you say "not really," is it because you don't remember or because you don't want to talk about it?

E.W.: I don't remember.

Trial, January 23, 2020 at 11:08:58-11:11:26 a.m.

COUNSEL: Now, you said you did not touch the toy, right?

E.W.: Right.

COUNSEL: You didn't play with it?

E.W.: No.

COUNSEL: And you didn't touch it at all?

-87-

E.W.:  No.

COUNSEL:  Okay.  And [Justice] never took any pictures of you with a toy, right?

E.W.:  Um, no.

COUNSEL:  Okay.  Because you never touched it. Okay.  And he never touched you with any of the toys?

E.W.:  Not, not really.

*Id*. at 11:22:52-11:23:25 a.m.

We now turn to the offending statements the Commonwealth made about this evidence during its closing arguments at the guilt phase (i.e., the statements the Commonwealth *actually* made that most closely approximate what Justice is taking issue with).  They are emphasized below:

> I just want to touch on what the defense said about the lab, talking about it being contaminated because [the sex toys] are all in the box together.  What's on those sex toys is [E.W.]'s DNA.  That wasn't her shirt that got put in there.[24]  Those weren't her sex toys that got put in there, those were adult sex toys used on her.  *How did her DNA get on there?  Because he used those sex toys on her*.  That's a fact we cannot ignore, and when [E.W.] was testifying, when [defense counsel] asked her about the sex toys at one point in time, she said "not really." She didn't want to talk about it.  *And how do we know that DNA on there is from a sex toy from his actions? It's because of that other picture of* [E.W.] *that her mother identified that has a vibrator inserted into her*

---

[24] A blue t-shirt was also taken from the house and stored with the sex toys.  The shirt, which belonged to Justice, had been discovered wrapped around a sex toy.

*vagina.* That's a sex toy that was inserted into her vagina. Whether she doesn't want to remember it, whether she doesn't want to talk about it, that physical picture shows you that was inserted into her vagina and it was a sex toy. These other sex toys were used on her as well, based on the DNA we found. If you look at those items, on the anal plug, that orange device that [C.J.] talked about, it was a mixture of three people. Now, the lab couldn't match it, but they did exclude her from the major component on the shaft of that.

Trial, January 24, 2020 at 10:57:20-10:58:53 a.m. (emphasis added).

We now return to why Justice takes issue with the Commonwealth's summation of the evidence. To review, Justice argues:

During closing arguments, the prosecutor misstated the evidence. Justice asserts that trial counsel was ineffective for failing to object to the prosecution statements that "DNA was on the sex toy because Justice inserted the toy in (E.W.) vagina," after defense counsel stated during closing that (E.W.) said (Justice) never took a picture and she never touched sex toys.

Appt. Br. at 25.

Stated otherwise, Justice is contending the Commonwealth improperly suggested to the jury that his alleged illicit actions toward E.W. were what caused E.W.'s DNA to be present on "the sex toy." He believes the Commonwealth's suggestion to that effect was improper because: (1) there was a possibility that E.W.'s DNA from one sex toy could have rubbed off onto another sex toy due to how all of the sex toys were packaged together; (2) E.W. – the minor child he allegedly victimized in a graphic, sexual manner – testified that she did not use any

-89-

of the adult sex toys Justice had presented to her; and (3) E.W. further testified Justice did not take pictures of her being sexually abused with adult sex toys. And, it appears Justice believes the Commonwealth was forbidden from assailing those points during its summation.

Justice's view of the law is grossly mistaken. During closing arguments before the jury, "[t]he prosecutor may draw all reasonable inferences from the evidence and announce his own theory to explain the evidence and why it supports the guilt of the defendant." *Bills v. Commonwealth*, 851 S.W.2d 466, 473 (Ky. 1993) (citation omitted). That is exactly what occurred here. To be sure, the three points enumerated above somewhat detract from the notion that, in Justice's words, "DNA was on the sex toy because Justice inserted the toy in (E.W.) vagina[.]" But, those points had inherent flaws. The possibility that E.W.'s DNA from one sex toy could have rubbed off onto another sex toy due to how all of the sex toys were packaged together merely begs the important question: how did DNA from a minor child come to be on *any* of the sex toys? As for E.W.'s testimony that she did not use the sex toys Justice offered her or that Justice did not take pictures of her, the Commonwealth properly inferred from E.W.'s understandably reluctant and embarrassed demeanor during her testimony that there were some things E.W. was unwilling to recall.

Furthermore, other evidence – including the discovery of E.W.'s DNA on multiple sex toys, C.J.'s testimony that she witnessed E.W. using a sex toy, and Emily's testimony that a photographic image discovered on one of Justice's electronic devices featured a sex toy being used on E.W. – reasonably supported the Commonwealth's comments that Justice takes issue with. In short, the Commonwealth's comments were well within the proper bounds of what was permitted during closing arguments; and Justice's trial counsel conformed with a sound trial strategy by not frivolously objecting to them.

**17. "The trial court erred, and demonstrated bias warranting recusal, by denying his RCr 11.42 counsel's motion to supplement his RCr 11.42 motion to raise additional issues."**

Justice argues that his RCr 11.42 counsel had "numerous issues to raise in supplement/amendment of Justice's original Motion"; that his RCr 11.42 counsel moved the trial court for leave to "supplement/amend" his original RCr 11.42 motion for the purpose of raising and asserting those issues; but that (according to Justice) the trial court told his RCr 11.42 counsel, "No! Lawyers ask for time to do that before hearing not after!" Appt. Br. at 27. Justice cites "VR 04-17-24, 01:28:50" as the point in time when his counsel made that "motion." He then proceeds to list three additional issues that he believes the trial court – but for its improper denial of his RCr 11.42 counsel's motion – should have addressed.

Relatedly, Justice also notes that on January 6, 2023, he filed a motion asking the presiding judge to voluntarily recuse herself from his RCr 11.42 proceedings; that his motion was denied on January 20, 2023; and he now asserts the denial of his motion was an abuse of the trial court's discretion because, in his view, the denial of his RCr 11.42 counsel's motion discussed above is evidence of the presiding judge's bias and animus toward him. "Had the trial court granted his Motion," he asserts, "Justice would not have been prejudiced by not being able to supplement/amend motion, which would have resulted in a favorable outcome considering the issues post-conviction counsel would have raised[.]" Appt. Br. at 29.

However, Justice's RCr 11.42 counsel made no such motion. "VR 04-17-24, 01:28:50" – when Justice asserts this motion was made – identifies the point at which his April 17, 2024 evidentiary hearing concluded. Proceeding from that point, the exchange between the trial court and the parties was as follows:

COURT: Any other witnesses for the defense?

COUNSEL: No more witnesses, your honor.

COURT: Commonwealth, do you have anything else you want to present to the court?

COMMONWEALTH: No, your honor.

COURT: Alright. Any argument counsel would like to make at this time?

COUNSEL: Well, that depends, your honor. Um, I intended to address these as preliminary issues, but we got started pretty quick. Um, it is typical for our postconviction cases that we request a post-hearing briefing schedule from the court, just in order to, one, go over the testimony we've heard today which was pretty extensive today, um, two, in your order you did grant a hearing on many issues, not just, you know, one singular one that would be simple to close an argument with today. Um, you know, also I was appointed to this case to represent him, Mr. Justice, at the evidentiary hearing based on his pro se claims. I have not had an opportunity to brief his case at all. Um, I do think it would be beneficial just from a mere caselaw aspect for me to be able to do that.

COURT: You should've done that way before today because this was the hearing. This was the hearing. I did grant him a request for a hearing, but I've never seen a lawyer not ask me before the hearing to address additional issues so you don't have a hearing, plus a hearing, plus a hearing. You have one hearing.

COUNSEL: *I do not intend to raise any additional issues. I just want to brief the issues that were discussed here today.*

COURT: Okay. I'm sorry, maybe I misunderstood what you were saying.

COUNSEL: No. I, it might've been the wording.

COURT: Okay.

COUNSEL: Um, like I said, this is just typical practice for us. I did discuss it with the Commonwealth earlier, I don't think she has an objection, necessarily.

COURT: So, all you really want is an opportunity to brief it?

-93-

COUNSEL:  Yes, ma'am. Typically, I'd suggest a 30-30, 15-15 schedule.

COURT:  Yeah, I don't think that's necessary here.  I mean, just because, you know –

COUNSEL:  Absolutely.  I always leave that, obviously –

COURT:  Thank you.

COUNSEL:  – to the discretion of the court.

April 17, 2024 hearing, 1:27:55-1:29:54 counter (emphasis added).

COURT:  What I'd be more inclined to do is make, have you all present to me proposed findings of facts.

COMMONWEALTH:  Okay.

COURT:  So that, any caselaw that would be, any caselaw, [defense counsel's] *not going to present to me, "well judge, we also now think that counsel did not do X," because I'm not going to hear any of that stuff, that should've all been presented beforehand, and* [defense counsel] *had indicated that's not what she intends to do*. I think I misunderstood her.  Her thing was just, I guess, summarize what she thinks, what she thinks that I heard, which I think if you do proposed findings of facts and conclusions of law, and then that would sort of do two purposes.  One, it would give in a finding of fact what you think I heard, and then two, the conclusions of law, that would be law that would support that finding.  And then that way, it would be something that would let me take apart and say yes, maybe I agree that this is a finding, no, this isn't a finding.  And then that way, you still get a briefing, but it's proposals to me, and then I can manipulate those.

-94-

*Id*. at 1:31:30-1:32:34 counter (emphasis added). Neither the Commonwealth, nor Justice's RCr 11.42 counsel, objected to the trial court's directives afterward.

In summary, Justice's RCr 11.42 counsel did not move the trial court for leave to raise additional issues. She merely asked the trial court for leave to file a brief that would summarize and discuss the issues Justice had *already* raised. Justice's arguments are therefore wholly unfounded and without merit. Tangentially, the record before us does not contain any proposed findings of fact or conclusions of law submitted by Justice's RCr 11.42 counsel, nor does Justice make an issue out of that fact.

**18. "The trial court erred by only granting him an evidentiary hearing on some, but not all, of the issues he raised in his RCr 11.42 motion."**

Justice's final argument is that the trial court should have granted him an evidentiary hearing to resolve *all* the issues he raised in his RCr 11.42 motion. We disagree. Over the course of this opinion, we have indicated that the trial court granted Justice an evidentiary hearing to address some of the issues he presented in his RCr 11.42 motion; we have delineated which of those issues the trial court granted Justice an evidentiary hearing to resolve and which of those issues the trial court summarily rejected; and we have explained – with respect to each of the issues the trial court summarily rejected – that the trial court committed no reversible error. We will not revisit those issues.

## CONCLUSION

For the reasons discussed above, we AFFIRM.


ALL CONCUR.


BRIEFS FOR APPELLANT:

Charles Justice, *pro se*
West Liberty, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Kristin L. Conder
Assistant Attorney General
Frankfort, Kentucky